UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| TELEXFREE, INC., | ) | |
| TELEXFREE, LLC, | ) | JURY TRIAL DEMANDED |
| JAMES M. MERRILL, | ) | |
| CARLOS N. WANZELER, | ) | |
| STEVEN M. LABRIOLA, | ) | |
| JOSEPH H. CRAFT, | ) | |
| SANDERLEY RODRIGUES DE VASCONCELOS, | ) | |
| SANTIAGO DE LA ROSA, | ) | |
| RANDY N. CROSBY and | ) | |
| FAITH R. SLOAN, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TELEXFREE FINANCIAL, INC., | ) | |
| TELEXELECTRIC, LLLP and | ) | |
| TELEX MOBILE HOLDINGS, INC., | ) | |
| | ) | |
| Relief Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("the Commission") alleges the following

against defendants TelexFree, Inc., TelexFree, LLC, James M. Merrill, Carlos N. Wanzeler,

Steven M. Labriola, Joseph H. Craft, Sanderley Rodrigues de Vasconcelos, Santiago De La

Rosa, Randy N. Crosby, and Faith R. Sloan, and relief defendants TelexFree Financial, Inc.,

TelecElectric LLLC, and Telex Mobile Holdings, Inc., and hereby demands a jury trial:

## PRELIMINARY STATEMENT

1.     This matter involves an illegal pyramid scheme operated by TelexFree, Inc. and

TelexFree, LLC (collectively, "TelexFree") and the eight individual defendants:  four principals

of TelexFree and four primary promoters of TelexFree.  TelexFree is a Massachusetts-based

"multi-level marketing" company that purports to be in the business of selling local and

international telephone service plans that use "voice over internet" ("VoIP") technology.  Since

at least November 2012, TelexFree and its principals, Merrill, Wanzeler, Labriola and Craft,

acting through promoters such as Rodrigues de Vancelos, De La Rosa, Crosby and Sloan, have

raised more than $300 million, largely from the Brazilian and Dominican immigrant

communities in Massachusetts and twenty other states, through a fraudulent and unregistered

offering of securities.  (TelexFree publicly claims to have raised more than $1 billion, but

documentation for that claim has not been made public.)  The securities take the form of

"memberships" that promise substantial returns – 200% per year or more – for becoming

promoters of the business.  TelexFree promises to pay promoters for:  (a) placing duplicative

TelexFree ads on internet sites – a process which, by itself, generates no revenue; and (b)

recruiting other investors who pay the membership fees that constitute the lion's share of monies

taken in by TelexFree.  Until changes to its compensation plan in March 2014, TelexFree did not

require promoters to sell its VoIP product in order to qualify for payments.

2.     Despite the misleading appearance of having a legitimate VoIP business, the

defendants are actually operating an elaborate pyramid scheme.  Documents available to date

indicate that its VoIP sales revenues – approximately $1.3 million – have generated barely 1% of

the nearly $1.1 *billion* needed to honor its promises to promoters for placing internet ads.  As a

result, in classic pyramid fashion, TelexFree is paying its older investors, not with revenue raised from the sale of its VoIP product, but with money received from newer investors.

3.      TelexFree has been a money-making machine for the defendants.  The company's financial records indicate that, since mid-November 2013, TelexFree has transferred approximately $30 million to be transferred from TelexFree operating accounts to themselves and to affiliated companies in the past few months to accounts owned and controlled by TelexFree or the individual defendants.  Tens of millions of additional investor funds received by TelexFree are presently unaccounted for.

4.      The defendants are continuing to enroll new investors every day, but it is clear that the pyramid has collapsed.  On March 9, TelexFree changed its compensation plan so that promoters would now be required to sell its VoIP product in order to qualify for the payments that TelexFree had previously promised to pay them.  The rule change generated a storm of protests from promoters who cannot recover their money.  On April 1, dozens of promoters descended on the company's office in Marlborough, Massachusetts to complain – in part because, as one of them told the press, the VoIP service is "almost impossible to sell".  Then on April 14 (yesterday), TelexFree filed for bankruptcy in Nevada under Chapter 11, admitting that it cannot meet its obligations with its VoIP revenues and seeking authority to reject all its current obligations to promoters.

5.      Through the activities alleged in this Complaint, the defendants have engaged and are still engaged in:  (a) fraudulent or deceptive conduct in connection with the purchase or sale of securities, in violation of Section 10(b) of the Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; (b) fraud in the offer or sale of securities, in violation of Section 17(a) of

the Securities Act of 1933 ("Securities Act"); and (c) the offer or sale of unregistered securities, in violation of Section 5 of the Securities Act.

6.    To halt the defendants' ongoing unlawful conduct, maintain the status quo, and preserve any remaining assets for defrauded investors before entry of a final judgment, the Commission seeks emergency equitable relief, including a temporary restraining order and preliminary injunction, to: (a) prohibit the defendants from continuing to violate the relevant provisions of the federal securities laws; (b) freeze the defendants' and the relief defendants' assets; (c) require the defendants and relief defendants to repatriate all proceeds of the fraud that are now located abroad; (d) require the defendants and relief defendants to submit an accounting of investor funds and other assets in their possession; (e) prevent the defendants and relief defendants from destroying relevant documents; and (f) authorize the Commission to undertake expedited discovery.

7.    The Commission also seeks: (a) a permanent injunction prohibiting the defendants from further violations of the relevant provisions of the federal securities laws; (b) disgorgement of the defendants' and relief defendants' ill-gotten gains, plus pre-judgment interest; and (c) civil penalties due to the egregious nature of the defendants' violations.

## JURISDICTION

8.    The Commission seeks a permanent injunction and disgorgement pursuant to Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d)(1) of the Exchange Act

4

[15 U.S.C. §78u(d)(1)]. The Commission seeks the imposition of civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

9.      This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§77t(d), 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa]. Venue is proper in this District because TelexFree, Inc. and TelexFree, LLC have their principal place of business in Massachusetts, and defendants Merrill, Wanzeler, Merrill, Labriola, and De La Rosa live in Massachusetts.

10.     In connection with the conduct described in this Complaint, the defendants directly or indirectly have made use of the mails or the means or instruments of transportation or communication in interstate commerce.

11.     The defendants' conduct has involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and has resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANTS

12.     TelexFree, Inc. is a Massachusetts corporation with its principal place of business in Marlborough, Massachusetts. Prior to a name change in February 2012, it was known as Common Cents Communications, Inc. ("Common Cents"), which was incorporated by defendants Wanzeler, Merrill and Labriola in 2002. TelexFree, LLC is a Nevada corporation with its principal place of business at the same address in Marlborough. It was incorporated by Wanzeler, Merrill, and Carlos Costa (a resident of Brazil) in July 2012, and it registered to do

5

business in Massachusetts in April 2013. TelexFree, Inc. and TelexFree, LLC have never been registered with the Commission, nor have they ever registered or attempted to register any offering of securities under the Securities Act or any class of securities under the Exchange Act. On April 14, 2014, TelexFree, Inc. and TelexFree, LLC filed for bankruptcy protection in Nevada under Chapter 11.

13.     James M. Merrill, age 52, lives in Ashland, Massachusetts. He is the co-owner of TelexFree, Inc. and TelexFree, LLC. Prior to the bankruptcy filing on April 14, 2014, he was also the president of TelexFree, Inc. He has appeared in many TelexFree promotional videos that have been posted on the internet. He is the owner of Cleaner Image Associates, Inc., a small commercial cleaning business that he has operated from his home in Ashland since 1986.

14.     Carlos N. Wanzeler, age 45, lives in Northborough, Massachusetts. He is the co-owner and treasurer of TelexFree, Inc. and the co-owner of TelexFree, LLC. He has appeared in many TelexFree promotional videos that have been posted on the internet. He is the owner of Brazilian Help, Inc. ("Brazilian Help"), a Massachusetts corporation with its principal place of business at TelexFree's address in Marlborough. He is also the owner of Above & Beyond the Limit, LLC, a New Mexico corporation.

15.     Steven M. Labriola, age 53, lives in Northbridge, Massachusetts. He is the international sales director of TelexFree and has appeared in many TelexFree promotional videos that have been posted on the internet. He was a founding director of Common Cents. He also operates Gyver Work, a small computer repair and maintenance business located in Southborough, Massachusetts.

16.     Joseph H. Craft, age 50, lives in Boonville, Indiana.  He is a Certified Public Accountant with offices in Indiana and Kentucky.  He is the chief financial officer of TelexFree, Inc. and TelexFree, LLC and prepares the company's financial statements.  He has been the chief financial officer of other multi-level marketing companies.

17.     Sanderley Rodrigues de Vasconcelos, age 42, previously lived in Revere, Massachusetts, and now lives in Davenport, Florida.  He is one of the most successful promoters of TelexFree, especially among the Brazilian community in Massachusetts and elsewhere.  He has appeared in TelexFree promotional videos that have been posted on the internet (he posted at least one himself), and he publicly claims to be the first U.S. promoter to become a millionaire. He is the owner of WWW Global Business Inc., a Massachusetts corporation that he formed in February 2013.  In 2007, he settled charges brought by the Commission for operating a fraudulent pyramid scheme known as Universo FoneClub Corporation.  He was permanently enjoined from violating Section 10(b) of the Exchange Act and Rule 10b-5, and Sections 5(a), 5(c) and 17(a) of the Securities Acts.  He was also ordered to pay approximately $1.8 million of disgorgement.

18.     Santiago De La Rosa, age 42, lives in Lynn, Massachusetts.  He is one of the most successful promoters of TelexFree, especially among the Dominican community in Massachusetts and elsewhere.  He has appeared in TelexFree promotional videos that have been posted on the internet.  He is the owner of Magica Media Corp., a Massachusetts corporation that he formed in March 2013.

19.     Randy N. Crosby, age 51, lives in Alpharetta, Georgia.  He is one of the most successful promoters of TelexFree and has appeared in TelexFree promotional videos that have

7

been posted on the internet. He has also promoted TelexFree through a website called "everybodygetspaidweekly.biz".

20.     Faith R. Sloan, age 51, lives in Chicago, Illinois. She is one of the most successful promoters of TelexFree and has appeared in promotional videos for TelexFree that have been posted on the internet. She has also promoted TelexFree through a website called "telexfreepower.com".

## RELIEF DEFENDANTS

21.     TelexFree Financial, Inc. ("TelexFree Financial") is a Florida corporation with its principal place of business in Coconut Creek, Florida. It was incorporated by Craft on December 26, 2013. Its officers and directors are Wanzeler and Merrill, and Wanzeler is its registered agent. On December 30 and December 31, 2013, it received wire transfers totaling $4,105,000 from TelexFree, Inc. and TelexFree, LLC. On April 14, 2014, TelexFree Financial filed for bankruptcy protection in Nevada under Chapter 11.

22.     TelexElectric, LLLP ("TelexElectric") is a Nevada limited partnership with its principal place of business in Las Vegas, Nevada. It was formed on December 2, 2013. Its general partners are Wanzeler and Merrill. Financial statements prepared by Craft indicate that TelexFree made a $2,022,329 "loan" to TelexElectric.

23.     Telex Mobile Holdings, Inc. ("Telex Mobile") is a Nevada corporation with its principal place of business in Las Vegas, Nevada. It was incorporated on November 26, 2013. Its officers are Wanzeler and Merrill. Financial statements prepared by Craft indicate that TelexFree made a $500,870 "loan" to Telex Mobile.

8

## STATEMENT OF FACTS

### Background of TelexFree

24.      In the late 1990s, Wanzeler and Merrill became sales agents for WorldxChange,

one of many companies then offering inexpensive long-distance phone service through "10-10"

access numbers. (To make a call, customers dialed the company's seven-digit access number

and then dialed the phone number they wanted to reach.) WorldxChange was a multi-level

marketing company using sales agents to recruit other sales agents as well as customers.

Wanzeler and Merrill recruited Labriola as one of their marketers. In 2002, the three of them

incorporated Common Cents as a vehicle for their sales efforts on behalf of WorldxChange.

Wanzeler did most of the company's recruiting through his contacts in Brazil and the Brazilian

community in Massachusetts. In 2003, however, the three stopped working with WorldxChange

after it was acquired by another company and ceased its multi-level marketing.

25.      In 2005, Wanzeler began selling analog telephone adapters – devices that link a

traditional telephone line with a digital network or VoIP service. Most of his customers were in

Brazil, and Wanzeler used the name "Brazilian Help" in the United States and "Disk A Vontade

Telefonia" (Portuguese for "Call Unlimited") in Brazil. The business relied primarily on

television and radio advertisements in Brazil to attract customers, because an attempt to employ

WorldxChange's multi-level marketing model was not successful. The monthly charge was

$49.90. In 2007, Wanzeler incorporated Brazilian Help in Massachusetts. Merrill assisted

Wanzeler but never held a title or an ownership interest in Brazilian Help.

26.      In early 2012, Carlos Costa, who had been Wanzeler's top sales agent in Brazil,

suggested that they start recruiting customers through advertisements on the internet. Taking

that suggestion, Wanzeler and Merrill changed the name of Common Cents to TelexFree, Inc. They adopted the name "99TelexFree" for their VoIP service, which they continued to price at $49.90 per month. Wanzeler, Costa, and associates in Brazil created a website called "telexfree.com". The site content was written in Portuguese and translated into English. In July 2012, Wanzeler, Merrill and Costa formed TelexFree, LLC, ostensibly to handle transactions outside Massachusetts.

27.     In November 2012, TelexFree began operations in the United States.

## The Structure of the Pyramid

### Emphasis on Recruiting New Members

28.     TelexFree purports to be in the business of providing its "99TelexFree" VoIP service, which costs $49.90 per month. Customers register their phone numbers with TelexFree and receive software that enables their computers to place phone calls through the company's network servers in Marlborough.

29.     It is no secret, however, that the primary business of TelexFree is recruiting new members and paying them to promote the company by placing internet advertisements and recruiting more members. As Merrill stated in a press release dated March 1, 2013:

> In addition to providing an excellent service at a very reasonable price, the real "secret sauce" of our success is our compensation plan. We have developed a unique system which allows every one of our independent representative [sic] the ability to make money every week. We actually pay our representatives weekly if they follow our system and advertise our service on the Internet.

30.    TelexFree's business model is straightforward:  in return for modest membership fees, it promises significant financial returns if promoters place meaningless ads for its VoIP product on the internet and recruit others to do the same.

31.    To reach out to new members, TelexFree relies on its company website and on websites maintained by its leading promoters.  The internal portion of the company website (usually called the "back office") contains marketing materials that promoters may download and use for their own websites and other recruiting efforts.  TelexFree monitors the activities of its promoters, who are not permitted to use any marketing materials that have not been approved by the company.  If TelexFree objects to something posted by a promoter, the company may limit the promoter's access to the company's internal website or even revoke the promoter's registration.  In addition, the individual defendants appear at public seminars, many of which are captured on videos that are posted on the internet, including sites such as "YouTube".  Examples of YouTube promotional videos featuring statements by one or more of the individual defendants include:

> December 14, 2012:  "Telexfree en Espanol – Santiago De La Rosa."
>
> March 13, 2013:  "TelexFree Steve Labriola – Atlanta Sheraton."
>
> March 13, 2013:  "TelexFree USA first Millionaire Sann Rodriguez [sic] Tells His Story."  The video was posted by Sloan.
>
> April 20, 2013:  "TelexFree Webinar Presentation + Leaders in HD."  The presentation was by Crosby.
>
> June 12, 2013:  "TelexFree Faith Sloan TelexFree Global Power Team Webinar."
>
> June 20, 2013:  "TelexFree Investigation with President James Merrill, Vice President Carlos Wanzeler and Steve Labriola."

11

June 21, 2013: "Testimonio Santiago de la Rosa Vision telexfree."

July 31, 2013: "TelexFree USA – Los Angeles 1." The video, which was posted by Rodrigues, includes remarks by Merrill, Wanzeler and Labriola.

August 1, 2013: "TelexFree Corporate Speakers at Newport Beach Extravanganza." The video includes comments by Merrill, Wanzeler and Labriola.

August 17, 2013: "Telexfree Intervención y testimonios Sann Rodriguez y Santiago De La Rosa."

October 16, 2013 "TelexFree Business Presentation – En Espanol con Santiago De La Rosa."

January 29, 2014: "TelexFree Steve Labriola Corporate Update Call 1/29/14."

April 6, 2014 "TelexFree Steve Labriola Lots of Questions I Have Answers."

## Membership Options

32.    TelexFree charged $50 for an investor to become a "member" or "partner". By itself, a membership was meaningless. The only way for an investor to make money was to become a "promoter" who placed internet ads, recruited new members, and/or sold the VoIP service.

33.    Prior to the rule change on March 9, 2014, TelexFree had two primary programs whereby promoters could make money by placing internet ads:

a.    The "AdCentral" program cost $339 ($50 membership fee plus $289 contract fee) for a 52-week contract. Promoters in the AdCentral program received ten one-month packages of "99TelexFree" VoIP service and were required to place one internet ad per day. For each week that AdCentral promoters placed the required number of ads, they received one additional VoIP package. AdCentral promoters who posted the necessary ads were promised

12

a weekly $20 payment, or $1,040 for the year. An AdCentral promoter who completed one 52-week contract was thus supposed to receive $1,040 – an annual return of 207% on an investment of $339.

          b.     The "AdCentral Family" program cost $1,425 ($50 membership fee plus $1,375 contract fee) for a 52-week contract. Promoters in the AdCentral Family program received fifty one-month packages of VoIP service and were required to place five internet ads per day. For each week that AdCentral Family promoters placed the required number of ads, they received five additional VoIP packages. AdCentral Family promoters who posted the necessary ads were promised a weekly $100 payment, or $5,100 for the year. An AdCentral Family promoter who completed one 52-week contract was thus supposed to receive $5,200 – an annual return of 265% on an investment of $1,425.

       34.     New members could pay the membership fee by credit card, or they could pay the promoter who recruited them (whose internal account with TelexFree would be debited in the amount of the fee). New members signed up through their promoter's page on the internal "back office" portion of the TelexFree website, registered their phone number, and received a personal log-in number.

### Incentives for Promoters

       35.     Prior to the rule change on March 9, 2014, TelexFree employed a multi-level marketing structure in two respects. First, it had several programs whereby promoters were promised commissions simply for recruiting new AdCentral or AdCentral Family members:

      a.      Promoters were promised a one-time bonus of $20 for each new AdCentral member and $100 for each new AdCentral Family member they recruited.

      b.      Promoters who recruited two additional promoters were promised a bonus of $20 for each direct or indirect participant in their "network", up to a maximum of $440.

      c.      Under the "Team Builder Plan", AdCentral Family promoters who recruited ten AdCentral Family members, each of whom sold five VoIP packages (to themselves or to others), were promised 2% of TelexFree's net billing in the following month, up to a maximum of $39,600.

      d.      Promoters were promised 2% of all payments to each participant in their network who had at least once active VoIP customer (which could be the participants themselves), down to six levels of the promoters' network.

36.      Second, TelexFree offered several commission programs for promoters based on sales of the "99TelexFree" VoIP service:

      a.      Promoters were promised a commission of 90% (or $44.90) for the initial VoIP package sold to a retail customer they recruited.

      b.      Promoters were promised a commission of 10% (or $4.99) per month for each direct participant who renewed the VoIP service and 2% (or $0.99) per month for each indirect participant who renewed the VoIP service, down to the sixth level of the promoters' network.

      c.      Promoters were promised a commission of 2% of all sales of VoIP packages by direct or indirect participants in their network, down to the sixth level of their network.

37.     Promoters received their own page in the website's "back office", so that they could keep track of the participants in their network.

### The Sole Requirement for Getting Paid:  Posting Internet Ads

38.     Prior to the rule change on March 9, 2014, there was no requirement that AdCentral promoters actually sell any VoIP packages in order to receive their weekly payments. Indeed, TelexFree and its promoters repeatedly emphasized that AdCentral members did not have to sell anything -- they simply had to post the internet ads. The slogan repeated over and over was "everybody gets paid weekly."

a.     One of the marketing presentations that appeared on the company's website was entitled "TelexFREE:  Advertise & Technology."  The presentation proclaimed, "Work over the Internet Posting ads daily."  Only one slide mentioned the VoIP service; the rest described the various membership and commission programs in detail.

b.     When telling his success story in an internet video on March 13, 2013, Rodrigues stated, "Just place your ads every day and everyone gets paid weekly."  He also asked and answered the following question:  "What company in the country, in the world, you can make money ... you don't need to sell anything?  Now it exists.  TelexFree."

c.     Crosby stated in an internet video on April 20, 2013, "What if you were with a company that would pay you just to advertise the service? ... They're paying us to advertise the service.  It's just that simple."  He added that members do not have to "worry about selling to the public."

      d.     Sloan stated in an internet video on June 12, 2013, "Place your ads, and you go about your day. You do that for seven days a week, you get paid every single week." She added, "You don't have to build. You don't have to sell."

      e.     Defendants often characterized the payments of $20 per week to AdCentral promoters and $100 per week to AdCentral Family promoters as the company's repurchase of the VoIP packages they received each week (at $20 each).

39.    Promoters were required to post ads written by TelexFree and found on the "back office" portion of the company website. Most of the ads offer a 60-minute free trial of the VoIP service. The "back office" also contains links to many external websites where the ads can be posted. Using a computer, the promoter copies the ad, pastes it on the external website, and returns to the "back office" to "validate" that the ad was placed.

40.    TelexFree and its promoters emphasized that the process of placing the ads is extremely simple.

      a.     One version of the marketing presentation on the company website stated, "TelexFree turnkey marketing system makes internet advertising simple & duplicatelable [sic]."

      b.     Another version of the marketing presentation on the company website stated: "We have it all computerized [sic], with only 3 steps, in your virtual office."

      c.     Crosby stated in his April 2013 video, "It takes less than thirty seconds to place each ad. Most people do it in 15 to 20 seconds."

      d.     Sloan stated in her June 2013 video, "You post your ads. Take you a minute and a half. Three minutes. Five minutes max."

41.     In fact, promoters who wanted to place many ads per day could take advantage of third-party services that automated the ad posting and validating process for a small fee.

42.     The sheer volume of virtually identical advertisements for TelexFree's VoIP service rendered them largely meaningless, especially because anyone who used "telexfree" as an internet search term would be led to the company's own website. In early April 2014, one website, Adpost.com, contained more than 33,000 ads for TelexFree, while another, ClassifiedsGiant.com, contained more than 25,000 ads posted just since February 1, 2014.

43.     TelexFree and its promoters repeatedly emphasized that promoters who posted ads and recruited more members could earn substantial amounts of money.

        a.      One version of the marketing presentation on the company website contained slides indicating that an AdCentral promoter could clear $2,296 per year on a $289 investment, that an Ad Central Family promoter could clear $11,599 per year on a $1,375 investment, and that a Team Builder promoter could receive as much as $39,600 per year.

        b.      Another version of the marketing presentation on the company website stated, "Earn Income Down to Infinity."

        c.      Telexfree stated in a March 1, 2013 press release that 23 promoters had already become millionaires in Brazil.

        d.      Crosby stated in his April 2013 video, "Dozens and dozens of people have become millionaires because of this." He added, "How deep does it go? It pays down to infinity."

        e.      Labriola stated in his January 2014 video, "There are some people that are making incredible money in this."

17

**Material Misrepresentations and Omissions about TelexFree**

44.     In all their statements to the public through the company website and internet videos, the defendants never disclosed that revenues from the VoIP business were very small (see paragraph 50 below) and that they were actually operating a pyramid scheme.

45.     In addition, TelexFree and its promoters made numerous false public statements about the company, its founders, and its business:

a.     The TelexFree website, in a section entitled "Founder", states that Merrill received a B.A. in Economics from Westfield State University.  The statement is false.  Merrill dropped out of Westfield State after only two years.

b.     The "Founder" section of the TelexFree website includes a photo of Merrill standing in front of a large three-story building, with the caption "Mr. Merrill in front of the headquarters of Telexfree in the USA."  At least two versions of the marketing presentation on the company website contained a photo of Merrill and a photo of the same building with the caption "The Company HS:  United States."  The use of the building photo is misleading.  TelexFree, Inc. does not own or occupy the entire building.  In fact, it originally shared a single suite (consisting of a receptionist, conference rooms, and cubicles) with 28 other companies.  Only in December 2013 did it move into its own suite, which occupies a portion of the first floor.  TelexFree, LLC has no physical office at all, just a mailing address in Nevada.

c.     On March 21, 2014, TelexFree issued a press release with the following quote from Merrill:  "We have been in VOIP telecommunications for more than a decade."  The statement is false.  As noted above, Common Cents was founded in 2002, and its business was marketing "10-10" long-distance plans for WorldxChange – not VoIP technology.

18

d.      The public portion of the TelexFree website contains a picture of a Best Western hotel and a banner reading "Hotel Best Western Opportunity." The TelexFree "back office" website includes an icon with the logo of Best Western Hotels that is entitled "Best Western, Telexfree Tijuca". At least one version of the marketing presentation on the company's website included descriptions of Best Western's activities in the United State and South America. Crosby stated in his April 2013 video, "This company has a joint venture with Best Western." The representation and other suggestions that TelexFree has a business relationship with Best Western is false. Ympactus Comercial Ltda. ("Ympactus"), a Brazilian corporation controlled by Wanzeler and Costa, has a promotional agreement with a Brazilian company that is partnering with Best Western on a new hotel. TelexFree has no relationship at all with Best Western.

e.      The "Founder" section of the TelexFree website states, "Being well versed in one of the new technologies in the era (VoIP), in 2002 he [Merrill] decided to found TelexFree, Inc. to serve this market." On August 1, 2013, Wanzeler told a gathering of TelexFree promoters, "We have a company since 1995. It's a VoIP product company." The statements are false, for several reasons. First, Common Cents – not TelexFree – was founded in 2002. Second, Wanzeler, Merrill and Labriola – not just Merrill – incorporated Common Cents. Third, the business of Common Cents was marketing "10-10" long-distance access plans for WorldxChange – not VoIP technology.

**Reassuring Statements about Regulatory Action by Brazil**

46.      In June 2013, a court in the Brazilian state of Acre suspended the operations of

Ympactus and froze its assets in Brazil, based on the suspicion of operating a pyramid scheme.

In a video posted on June 20, 2013, Merrill, Wanzeler and Labriola sought to reassure promoters.

Merrill stated, "Inquiries like this are very common in network marketing… We have such

unbelievable growth that we're going to draw attention." Labriola stated, "These things happen

to network marketing companies over and over again… Let's not worry about it." Wanzeler

added, "We're still here. We're going to stay here for a long time."

47.      In its bankruptcy filings on April 14, 2014, however, TelexFree claims that after

the Brazilan enforcement action against Ympactus, it began planning to restructure its

compensation program – planning which resulted in the changes announced on March 9, 2014.

48.      Defendants did not disclose that several banks and at least one payment processor

stopped doing business with TelexFree, apparently due to concerns about the legality of its

multi-level marketing program.  As a result, TelexFree has repeatedly been forced to open new

accounts at different banks and to switch payment processors.

**Secrets of the Pyramid**

49.      After the enforcement action in Brazil, certain persons affiliated with TelexFree

made public statements to the effect that TelexFree is different from illegal multi-level marketing

programs because it has an actual product to sell – the 99TelexFree VoIP service.

a.      In a video posted on August 2, 2013, Gerald Nehra, who claims to be the

TelexFree's attorney, stated, "The special ingredient is that you have a real product."

20

b.      In a video posted on August 15, 2013, Costa stated that TelexFree "never

was, never will be" an illegal pyramid because of the sales of the VoIP service. He asserted,

"We do not depend on everyone coming in in order to pay the people who are already in."

50.     The reality is quite different. Based on the information available to date, it is

clear that TelexFree's VoIP revenue has been only a small fraction of the money it promised to

pay to AdCentral promoters. Credit card transactions from August 2012 to March 2014 indicate

that TelexFree received slightly more than $1.3 million from the sale of approximately 26,300

VoIP contracts. During the same period, TelexFree received more than $302 million from

approximately 48,000 AdCentral promoters and 202,000 AdCentral Family promoters. Through

the sale of those one-year contracts, TelexFree promised to pay more than $1.1 billion to the

promoters who placed the required internet ads – a task which, as explained above, was

extremely easy to accomplish. In other words, the receipts from selling VoIP packages covered

barely 1% of TelexFree's obligations to pay promoters who placed ads. The disparity between

TelexFree's VoIP revenues and its AdCentral obligations was actually worse than that, because

the $1.1 billion of estimated obligations does not include the commissions and incentives that

TelexFree promised to pay to promoters under the additional programs described above.

51.     In short, TelexFree was operating a classic pyramid. Because revenues from

VoIP sales were so small, TelexFree was forced to use money from newer investors to make its

payments to older investors.

**Diversion of Funds**

52.     The Commission has not yet been able to obtain a complete set of statements from the defendants' banks, brokerage firms, and credit card payment processing services. However, the information available to date, from bank records and other financial records as well as from statements made by various defendants, indicates that Merrill and Wanzeler, who had sole authority to transfer TelexFree corporate funds until the bankruptcy filing, have caused more than $30 million to be transferred from TelexFree operating accounts to themselves and to affiliated companies in the past few months:

        a.      Bank statements show that TelexFree Financial, Inc. received $4,105,000 on December 30 and December 31, 2013.

        b.      Financial statements prepared by Craft indicate that TelexFree made a $2,022,329 "loan" to TelexElectric.

        c.      Financial statements prepared by Craft indicate that TelexFree made a $500,870 "loan" to Telex Mobile.

        d.      Bank statements show that, in December 2013, approximately $14.3 million was transferred to newly-created brokerage accounts in the name of TelexFree, LLC.

        e.      Bank statements show that Merrill received $3,136,200 on December 26 and December 27, 2013.

        f.      Bank statements show that Wanzeler received $4,317,800 on December 26 and December 27, 2013.

g.    Bank statements show that two companies controlled by Craft received more than $2,010,000 between November 19, 2013 and March 14, 2014.

h.    Federal wire transfer records show that Wanzeler wired $3.5 million to the Oversea-Chinese Banking Corporation in Singapore on January 2, 2014.

i.    In addition, a bank has informed the Commission that TelexFree, LLC sent $10,389,000 to an entity known as TelexFree Dominicana, SRL on April 3, 2013.

53.    Also, on April 11 (just before TelexFree filed for bankruptcy), Merrill and the wife of Wanzeler obtained cashier's checks in the total amount of $25,552,402. The checks are payable to TelexFree, LLC.

## Collapse of the Pyramid

54.    On March 9, 2014, TelexFree made changes to its compensation plan that made it much harder for promoters to qualify for payments. The most significant change was that promoters may not receive any payments – even if they had qualified for the payments before March 9 – until they have recruited ten VoIP customers, including five who remain active each month, as well as two direct recruits who each have five active VoIP customers per month. In other words, promoters must now actually sell the TelexFree's VoIP product in order to get paid.

55.    The rule change generated a storm of protests from AdCentral members. On April 1, dozens of members descended on the company's office in Marlborough to complain – in part because, as one member told the press, the VoIP service is "almost impossible to sell".

56.    On April 14, 2014, defendants TelexFree, Inc. and TelexFree, LLC and relief defendant TelexFree Financial Inc. filed for bankruptcy in Nevada under Chapter 11. The three

23

companies claimed to have liabilities of as much as $600 million but assets of no more than $120 million. The companies stated that, in the five weeks after the March 9 rule change, promoters submitted claims for $174 million, primarily for AdCentral ad placements. The companies also stated that revenues under the new March 9 compensation plan – which requires AdCentral promoters to sell VoIP products in order to get paid – have been so disappointing that the companies cannot meet their obligations. Confirming that VoIP sales have not generated enough revenue to honor their promises to AdCentral promoters, the companies seek authority to reject all existing AdCentral contracts.

57.     The whereabouts and/or disposition of much of the more than $300 million of investor funds raised by TelexFree is unknown.

### FIRST CLAIM FOR RELIEF
#### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5)

58.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-56 of the Complaint as if set forth fully herein.

59.     Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) have employed or are employing devices, schemes or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

24

60.     As a result, defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C.§78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

### SECOND CLAIM FOR RELIEF
### (Violation of Section 17(a) of the Securities Act)

61.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-56 of the Complaint as if set forth fully herein.

62.     Defendants, directly and indirectly, acting intentionally, knowingly or recklessly, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails:  (a) have employed or are employing devices, schemes or artifices to defraud; (b) have obtained or are obtaining money or property by means of untrue statements of material fact or omissions to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) have engaged or are engaging in transactions, practices or courses of business which operate as a fraud or deceit upon purchasers of the securities.

63.     As a result, defendants have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

### THIRD CLAIM FOR RELIEF
### (Violation of Sections 5(a) and 5(c) of the Securities Act by
### Defendants TelexFree, Inc., TelexFree, LLC, Merrill and Wanzeler)

64.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-56 of the Complaint as if set forth fully herein.

25

65.     TelexFree, Inc. and TelexFree, LLC have never registered or attempted to register any offering of securities under the Securities Act or any class of securities under the Exchange Act, and no exemption from registration was available.

66.     Defendants TelexFree, Inc., TelexFree, LLC, Merrill and Wanzeler, directly or indirectly:  (a) have made or are making use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) have made or are making use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

67.     Defendants TelexFree, Inc., TelexFree, LLC, Merrill and Wanzeler have violated and, unless enjoined, will continue to violate Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.     Enter a preliminary injunction, order freezing assets, and order for other equitable relief in the form submitted with the Commission's motion for such relief;

B.     Enter a permanent injunction restraining defendants and each of his agents, servants, employees and attorneys and those persons in active concert or participation with them

who receive actual notice of the injunction by personal service or otherwise, including facsimile

transmission or overnight delivery service, from directly or indirectly engaging in the conduct

described above, or in conduct of similar purport and effect, in violation of:

      1.      Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5] as to all defendants;

      2.      Section 17(a) of the Securities Act [15 U.S.C. §77q(a)] as to all defendants; and

      3.      Section 5 of the Securities Act [15 U.S.C. §77e] as to defendants TelexFree, Inc., TelexFree, LLC, Merrill and Wanzeler;

C.      Require defendants to disgorge their ill-gotten gains and losses avoided, plus pre-

judgment interest, with said monies to be distributed in accordance with a plan of distribution to

be ordered by the Court;

D.      Order defendants to pay an appropriate civil penalty pursuant to Section 20(d) of

the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C.

§78u(d)(3)];

E.      Retain jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

F.   Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

*Frank C Huntington*

Frank C. Huntington  (Mass. Bar No. 544045)
   Senior Trial Counsel
Kevin M. Kelcourse (Mass. Bar No. 643163)
   Assistant Director
Deena R. Bernstein (Mass. Bar No. 558721)
   Senior Trial Counsel
James M. Fay (Mass. Bar No. 553435)
   Senior Counsel
Scott Stanley (NY Bar No. 4504601)
   Staff Attorney
Martin F. Healey (Mass Bar No. 227550)
   Regional Trial Counsel

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
Boston Regional Office
33 Arch Street
Boston, MA  02110
(617) 573-8960  (Huntington direct)
(617) 573-4590  (fax)
huntingtonf@sec.gov  (Huntington email)

Dated:  April 15, 2014