UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>TELEXFREE, INC.,<br>TELEXFREE LLC,<br>JAMES M. MERRILL,<br>CARLOS N. WANZELER,<br>STEVEN M. LABRIOLA,<br>JOSEPH H. CRAFT,<br>SANDERLEY RODRIGUES DE VASCONCELOS,<br>SANTIAGO DE LA ROSA,<br>RANDY N. CROSBY and<br>FAITH R. SLOAN,<br><br>Defendants,<br><br>and<br><br>TELEXFREE FINANCIAL, INC.,<br>TELEXELECTRIC, LLC and<br>TELEX MOBILE HOLDINGS, INC.,<br><br>Relief Defendants. | Case No. 1:14-cv-11858-NMG |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR A PRELIMINARY INJUNCTION,
ORDER FREEZING ASSETS, AND
ORDER FOR OTHER EQUITABLE RELIEF
AS TO DEFENDANTS DE LA ROSA AND CROSBY**

Plaintiff Securities and Exchange Commission ("the Commission") submits this memorandum of law in support of its motion for a preliminary injunction, order freezing assets, and order for other equitable relief as to defendants Santiago De La Rosa and Randy Crosby. In further support of its motion, the Commission relies upon the pleadings filed on April 15 in

1

support of its *ex parte* motion for a temporary restraining order, as well as the Declarations of Claudio Gil and Jason Farrell, the Second Declaration of Mark Albers, and the Third Declaration of Scott Stanley, all of which are filed herewith. The Commission is also submitting a proposed form of order as to De La Rosa and Crosby.

## INTRODUCTION

On April 16, 2014, Judge Casper entered an *ex parte* temporary restraining order, order freezing assets, and other equitable relief as to all defendants and relief defendants. The question now before the Court is whether to convert the April 16 order into a preliminary injunction as to defendants De La Rosa and Crosby.[1] Such relief is warranted because the Commission has made a sufficient showing that it is likely to succeed on the merits – that TelexFree is operating an illegal Ponzi or pyramid scheme, and that De La Rosa and Crosby are leading promoters of the scheme who know or are reckless in not knowing that, in classic fashion, TelexFree is paying its older investors, not with revenue raised from the sale of its "voice over internet" ("VoIP") service, but with money received from newer investors in its AdCentral programs.

## STATEMENT OF FACTS

### A. Background on De La Rosa and Crosby

Santiago De La Rosa, age 42, lives in Lynn, Massachusetts. [April 15, 2014 Evidentiary Appendix ("App."), Ex. I-5.] He is one of the most successful promoters of TelexFree, especially among the Dominican community in Massachusetts and elsewhere. [App., Ex. C-2

---

[1] A hearing as to defendants TelexFree, Inc., TelexFree, LLC, James Merrill, Carlos Wanzeler, Joseph Craft, and Steven Labriola is scheduled for May 8, 2014. Defendant Rodrigues was served on April 19, 2014, but to date, no attorney has filed an appearance on his behalf. On April 17, Commission counsel notified defendant Sloan by telephone about the filing of the case and the Court's order of April 16, but Sloan refused to provide a mailing address and effectively dared the Commission to find her and serve her. Third Stanley Decl., ¶¶2-7.

(Wanzeler Test.), p.223; Farrell Decl., ¶4.] He has given many promotional speeches for TelexFree that have been posted as videos on the "YouTube" website. [Gil Decl., ¶¶2-7.] He is the owner of Magica Media Corp., a Massachusetts corporation that he formed in March 2013. [App., Ex. A-10.]

Randy N. Crosby, age 51, lives in Alpharetta, Georgia. [App., Ex. I-3.] He is one of the most successful promoters of TelexFree. [Farrell Decl., ¶4.] He has given many promotional speeches for TelexFree that have been posted as "YouTube" videos.[2] [Farrell Decl., ¶¶2-5.] He has also promoted TelexFree through his website called "everybodygetspaidweekly.biz". [App., Ex. E-1; Farrell Decl., ¶5, #2.]

### B. De La Rosa and Crosby's Promotion of TelexFree's Investment Program

#### 1. The Membership Options

In promotional videos, De La Rosa and Crosby described TelexFree's two membership options as follows:[3]

1. The "AdCentral" program cost $339 ($50 membership fee plus $289 contract fee) for a 52-week contract. Promoters received ten one-month packages of the VoIP service and were required to place one internet ad per day. For each week that they placed the ads, they received one additional VoIP package. Promoters who posted the necessary ads were promised a weekly $20 payment, or $1,040 for the year (*i.e.*, an annual return of 207% on an investment of $339).

2. The "AdCentral Family" program cost $1,425 ($50 membership fee plus $1,375 contract fee) for a 52-week contract. Promoters received fifty one-month packages of VoIP service and were required to place five internet ads per day. For each week that they placed the required number of ads, they received five

---

[2] On one video, Crosby stated, "I give this presentation every day, several times a day." [Farrell Decl., ¶2, #44.]

[3] The following discussion concerns the investment program prior to the rule change, which TelexFree announced on March 9, 2014, whereby promoters must actually sell the VoIP service in order to get paid. [*See* App., Ex. C-1 (Merrill Test.,), pp.68-70, 103-105, 110-111; Ex. C-2 (Wanzeler Test.), pp.48-49.]

3

additional VoIP packages. Promoters who posted the necessary ads were promised a weekly $100 payment, or $5,100 for the year (*i.e.*, an annual return of 265% on an investment of $1,425).

[Gil Decl., ¶2, ##7-8; ¶5, ##1-4; Farrell Decl., ¶2, ##11, 30; ¶5, #14.]

### 2. The Incentives for Promoters

As De La Rosa and Crosby explained in promotional videos, TelexFree employed a multi-level marketing structure in two respects. First, there were commissions for recruiting new AdCentral members.

1. A one-time bonus of $20 for each new AdCentral member and $100 for each new AdCentral Family member they recruited.

2. A bonus of $20 for each direct or indirect participant in a promoter's "network", up to a maximum of $440, as long as the promoter recruited two additional AdCentral promoters.

3. 2% of all payments to each AdCentral participant in the promoter's network who had at least once active VoIP customer (which could be the participants themselves), down to six levels of the promoter's network.

4. 2% of TelexFree's net monthly billing, up to a maximum of $39,600, for an AdCentral Family promoter who recruited ten new AdCentral Family members, each of whom sold five VoIP packages (to themselves or to others).

[Gil Decl., ¶2, ##12-13, 16, 18; ¶6, #4; Farrell Decl., ¶2, ##30, 33-34, 36, 39-40, 42; ¶5, ##19, 21-22.]

Second, there were commissions based on sales of the VoIP service:

1. 90% (or $44.90) for the initial sale of a VoIP package (priced at $49.90) to a retail customer they recruited.

2. 10% (or $4.99) per month for each direct participant who renewed the VoIP service and 2% (or $0.99) per month for each indirect participant who renewed the VoIP service, down to the sixth level of the promoter's network.

3. 2% of all sales of VoIP packages by direct or indirect participants in the promoter's network, down to the sixth level.

[Gil Decl., ¶2, #15; Farrell Decl., ¶2, ##14, 18, 21, 31; ¶5, #15.]

### 3. The TelexFree "Back Office"

New members could pay the membership fee by credit card, or they could pay the promoter who recruited them (whose internal account with TelexFree would be debited for the amount of the fee). New members signed up through their promoter's page on the internal portion of the TelexFree website (called the "back office"), registered their phone number, and received a personal log-in number. Promoters received their own page in the "back office", so that they could keep track of payments to and from participants in their network who purchased new AdCentral memberships or new VoIP service. [App. Ex. C-1 (Merrill Test.), pp.80-82; Ex. C-2 (Wanzeler Test.), pp.48-57; Ex. C-3 (Alves Test.), pp.58-59; Farrell Decl., ¶2, ##35-36.]

### 4. The Sole Requirement for Getting Paid: Posting Internet Ads

De La Rosa and Crosby waxed eloquent about how AdCentral members did not have to sell anything – they simply had to post the internet ads. For example, De La Rosa stated:

> The business opportunity has finally arrived where you don't have to make monthly payments, you don't have to make deliveries or buy anything. Simply work from the comfort of your own home making ads for this wonderful company that is TelexFree. [Gil Decl., ¶2, #19.]

> People ask me how did you do it... I say is very easy to take on this opportunity... Things everyone should know... 1) learn the basics -- how to place an ad, register a client, register a promoter..., 2) teach others the skills..., 3) commit to your team. [Id., ¶4, #12.]

> Every day 365 days a year you place an ad. [Id., ¶5, #2.]

Similarly, Crosby stated:

> You can make money every week even if you didn't make a sale that week. [Farrell Decl., ¶2, #15.]

> It's not a dream, everyone can control their own income, the amount of contracts you have will depend on the amount of income you can make... Your contracts are not dependent on somebody else saying yes or no, and that makes you in the driver's seat because you are in control. [Id., ¶2, ##25-26.]

5

> We don't have people that join and can't make money because they can't recruit or can't sell to the public. Everybody gets paid weekly. [*Id.*, ¶2, #29.]
>
> Doesn't matter what plan you sign the customer up for, either AdCentral or AdCentral Family contract, the more contracts you own the more income you can make, without sponsoring or recruiting or worry about selling to public, you know what you're going to make. [*Id.*, ¶2, #46.]
>
> All we do is place ads. It's simple. [*Id.*, ¶3, #2.]
>
> Instead of 80-90% of people not making money in other sales companies, you have this company where 100% of the people earn income without sponsoring or without selling to the public. [*Id.*, ¶5, #8.]
>
> You will still profit weekly with this company even if everybody said NO to your product or service, or if they say NO they don't want to join this opportunity right now. [*Id.*, ¶5, #10.]

De La Rosa and Crosby also emphasized that the process of placing the ads is extremely simple. For example, De La Rosa stated, "Posting the daily ads is easy, simply copy and paste." [Gil Decl., ¶6, #2.] Similarly, Crosby stated: "You place an ad about the TelexFree service. The ads are already written. You simply copy and paste the ads on free advertising sites. We even provide you with a list of free advertising sites. It's that simple." [Farrell Decl., ¶2, #11.]

Reinforcing the idea that sales of the VoIP service were not required, De La Rosa and Crosby characterized the payments of $20 per week to AdCentral promoters and $100 per week to AdCentral Family promoters as TelexFree's repurchase of the unsold VoIP packages they received each week (at $20 each). For example, De La Rosa stated, "If you cannot sell the product that they give you, the company buys it back from you for $20." [Gil Decl., ¶5, #3.] Similarly, Crosby stated, "If it doesn't sell to the public then you can sell back them back to the company for $20." [Farrell Decl., ¶2, #19.]

### 5. The Prospect of Getting Very Rich

De La Rosa and Crosby enthusiastically proclaimed that promoters who posted ads and

recruited more members could receive substantial amounts of money, and that many promoters had already become millionaires. For example, De La Rosa stated:

> How did TelexFree change your life? 360 degrees, only 5 months ago my family only had 100 dollars in savings... I can't say I am a millionaire or multi-millionaire, but will be in the next couple of months... Now we have an account in the bank with more than six figures. [Gil Decl., ¶3, ##2-4.]

Similarly, Crosby stated:

> We are the pioneers in this industry and we have caused more people to become successful, dozens and dozens of millionaires because of this. [Farrell Decl., ¶2, #23.]

> Compensation plan is top of the line just like a Bentley car – paying up to $15,360 per day. [*Id.*, ¶2, #38.]

> If you had 10,000 AdCentral Family contracts with 2% override, then you would make $1,040,000 for the year. [*Id.*, ¶2, #41.]

> How many people would like to take $1,375 and put it in their closet and come back a year from now, all you have to do is open your closet door every day. Right? For 365 days and walk back in now and that $1,375 is $5,200. Would everybody like a policy like that? Guys, we don't need a policy, we've got TelexFree. [*Id.*, ¶3, #3.]

> TelexFree has produced the solution to everybody's problems. [*Id.*, ¶5, #7.]

### C. Collapse of the Pyramid

On March 9, 2014, as noted above, TelexFree changed its compensation plan so that promoters could not receive any payments – even if they had previously qualified for the payments – until they actually sold the VoIP service. The rule change generated a storm of protests from AdCentral members. On April 1, dozens of members descended on the company's office in Marlborough to complain – in part because, as one member told the press, the VoIP service is "almost impossible to sell". [App., Ex. F-3.]

On April 14, 2014, defendants TelexFree, Inc. and TelexFree, LLC and relief defendant

TelexFree Financial Inc. filed for bankruptcy in Nevada under Chapter 11.[4] The three companies claim to have liabilities of as much as $600 million but assets of no more than $120 million. [App., Exs. B-1, B-2 & B3.] They stated that, in the five weeks after the March 9 rule change, promoters tried to withdraw $174 million, primarily commissions due for AdCentral recruiting. [App., Ex. B-4, ¶35.] The companies admitted that sales of the VoIP service are too small for them to meet their obligations. [*Id.*, ¶¶30, 37.]

## ARGUMENT

### I. The Standard for Entering a Preliminary Injunction

The Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") provide that, in a Commission enforcement action, a court shall enter a temporary restraining order or preliminary injunction "upon a proper showing". 15 U.S.C. §77t(b); 15 U.S.C. §78u(d)(1); *see also Aaron v. SEC*, 446 U.S. 680, 688-689 (1980). The proper showing requires "a likelihood of success on the merits, a risk of irreparable harm, a favorable balance of equities, and that the injunction would be in the public interest." *SEC v. Fife*, 311 F.3d 1, 8 (1st Cir. 2002), *cert. denied*, 538 U.S. 1031 (2003). A court has broad discretion to consider evidence by affidavit, rather than live testimony, when deciding whether to enter a preliminary injunction. *Rice v. Wells Fargo Bank, N.A.*, 2014 WL 868785, *4 (D.Mass. March 5, 2014).

### II. The Commission Has Made the Necessary Showing for a Preliminary Injunction

#### A. Likelihood of Success on the Merits

---

[4] The Commission has filed a motion for a change of venue to Massachusetts.

1. **TelexFree's Fraudulent Scheme**

Based on the information available to date, TelexFree's VoIP revenue has been only a small fraction of the money it promised to pay to AdCentral promoters. Credit card transactions from August 2012 to March 2014 show that TelexFree received slightly more than $1.3 million from the sale of approximately 26,300 VoIP contracts. During the same period, TelexFree received more than $302 million from approximately 250,000 AdCentral or AdCentral Family promoters. Through the sale of those one-year contracts, TelexFree promised to pay more than $1.1 billion to promoters who placed the required internet ads. [Albers Decl., ¶7.] In other words, the receipts from selling VoIP packages covered barely 1% of TelexFree's obligations to pay promoters who placed the ads.[5]

The Commission will not repeat its previous arguments that the TelexFree investment program violates the antifraud provisions of the federal securities laws. The bottom line is that the program has elements of both a Ponzi scheme (using money from newer AdCentral members to make payments to older AdCentral members) and a pyramid scheme (offering commissions and other incentives for recruiting new AdCentral members). The First Circuit has found that both types of scheme are "investment contracts" that violate Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, as well as Section 17(a) of the Securities Act of 1933, because of the failure to disclose that a collapse is inevitable when the supply of new members dries up. *See SEC v. SG Ltd.*, 265 F.3d 42, 49-51 (1st Cir. 2001).

2. **The Scienter of De La Rosa and Crosby**

---

[5] The disparity between TelexFree's VoIP revenues and its AdCentral obligations was actually worse than that, because the $1.1 billion of estimated obligations does not include the commissions and incentives that TelexFree promised to pay to promoters under the additional programs described above.

Scienter is a mental state embracing intent to deceive or defraud, and it includes recklessness.[6] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 38 (1st Cir. 2002); *Brumbaugh v. Wave Sys. Corp.*, 416 F.Supp.2d 239, 252 (D.Mass. 2006). The evidence set forth above supports a strong inference that De La Rosa and Crosby acted with scienter:

1. De La Rosa and Crosby have been leading promoters of TelexFree since it began operations in the United States in late 2012.

2. In June 2013, a Brazilian state court suspended the operations of a TelexFree affiliate and froze its assets, based on the suspicion of operating a pyramid scheme. [App., Ex. C-2 (Wanzeler Test.), pp.108, 111-115.] Nevertheless, De La Rosa and Crosby continued to actively promote TelexFree on the internet. [*See* Gil Decl., ¶¶3-6; Farrell Decl., ¶5.]

3. De La Rosa and Crosby knew or were reckless in not knowing that the sheer volume of identical internet ads rendered them meaningless as a vehicle for attracting new retail VoIP customers, especially because anyone who used "telexfree" as an internet search term would be led directly to the company's own website.

4. Through TelexFree's internal "back office", De La Rosa and Crosby had access to detailed information about payments to and from participants in their network who purchased new AdCentral memberships or new VoIP service. Given the information available to them about the investments by participants in their own networks, it is very likely that they knew or were reckless in not knowing that the vast majority of money paid by participants in their networks was for AdCentral memberships, not for sales of the VoIP service.

---

[6] Section 17(a)(1) of the Securities Act requires scienter, but negligence is sufficient to establish liability under Sections 17(a)(2) and (3). *Aaron v. SEC*, 446 U.S. 680, 695-97 (1980). The distinction is unimportant here because there is ample evidence of defendants' scienter.

5. TelexFree promised to pay a 90% rebate on initial sales of the VoIP service. [Farrell Decl., ¶2, ##21, 31.] Such a large rebate on a VoIP sale made it even harder to believe that the company could generate sufficient revenue from VoIP sales to cover its obligations to AdCentral promoters.

6. In light of the above, it is very reasonable to infer that De La Rosa and Crosby knew or were reckless in not knowing that TelexFree was using money from newer AdCentral members to make payments to older AdCentral members – the essence of a Ponzi or pyramid scheme.

7. The inference that De La Rosa and Crosby acted with scienter is reinforced by their refusal to provide the accounting required under Paragraph VI of the April 16 Order, or to respond to the Commission's request on April 22, as permitted by the April 16 order allowing expedited discovery,[7] for a statement identifying: (i) their bank accounts and current balances; (ii) the total amount of money they paid into TelexFree and the total amount of money they received from TelexFree; and (iii) the total amount of money paid to TelexFree by participants in their network(s), broken down by AdCentral memberships vs. VoIP sales. This information is readily available to De La Rosa and Crosby, and their inexcusable refusal to provide it warrants an adverse inference that the information would undercut their claim that they did not act with scienter. *See* Fed. R. Civ. P. 37)b)(2)(A)(i).

### B. The Other Three Factors

The evidence cited above also establishes that the Commission has made a sufficient

---

[7] Counsel for De La Rosa and Crosby assert that the April 16 order allowing expedited discovery does not affect the ordinary 30-day deadline under Rule 34 for responding to a request for the production of documents. This untenable position would eliminate the possibility of conducting expedited discovery prior to a preliminary injunction hearing.

showing as to the risk of irreparable harm to investors, the balance of equities, and the public interest. Given the fraudulent nature of TelexFree's membership programs, which have not been suspended, and the risk that De La Rosa and Crosby will dissipate funds received from new investors before a judgment on the merits, a preliminary injunction is warranted.

### III. The Commission Has Made the Necessary Showing for Continuing the Asset Freeze

A court may order an asset freeze to effectuate the purposes of the federal securities laws and to ensure that wrongdoers do not profit from their unlawful conduct. *SEC v. Manor Nursing*, 458 F.2d 1082, 1103 (2nd Cir. 1972). As Judge Saris stated in *SEC v. Pinez*:

> In an SEC enforcement action, "[t]he ultimate remedies available to the court include disgorgement, restitution, and rescission," and it is well-established that "[t]o preserve a basis for such remedies, the court may impose an interim asset freeze."

989 F.Supp. 325, 336 (D.Mass. 1997), *remanded on other grds.*, 157 F.3d 2 (1st Cir. 1998) (citations omitted). An asset freeze is crucial "because of the high risk that any remaining investment funds or proceeds thereof would be further depleted without such an order." *Fife*, 311 F.3d at 8.

The same four-part test for whether to enter a preliminary injunction also applies for whether to enter an asset freeze. *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 161 (1st Cir. 2004). One critical question is whether the Commission has shown a likelihood of success on the merits. As Judge Saris stated in *Pinez*:

> In the usual case, once the SEC has demonstrated a likelihood of success on the merits of its claim that a defendant has committed a violation of federal securities law, it can obtain an order that preserves the proceeds of such violation until it may be proven at trial…

989 F.Supp. at 336. As explained above, the Commission has made the required showing.

A second question is a risk of irreparable harm "where there is a strong indication that the defendant may dissipate or conceal assets." *Micro Signal Research Inc. v. Otus*, 417 F.3d 28, 31 (1st Cir. 2005). The Commission has not yet received complete bank account information for De La Rosa and Crosby (in part because they have refused to provide any information themselves), but the documents available to date indicate:

1. Between April 2013 and February 2014, nearly $1.2 million was deposited into De La Rosa's Magica Media accounts at Bank of America. Many of these deposits were in denominations consistent with TelexFree's AdCentral membership fees and contain references on the memo line to "TelexFree", "Bonos TelexFree" or "AdFamily". During that period, De La Rosa wrote more than $140,000 of checks to himself, many of which are identified on the memo line as "commissions". He withdrew more than $20,000 in cash, paid $100,000 to an entity called SMC Partners, and made regular payments to BMW, apparently for an automobile. He also transferred the net amount of more than $215,000 from his Magica Media accounts to two other unidentified bank accounts. The current balance in the De La Rosa accounts that the Commission has identified to date is zero. [Second Albers Decl., ¶6.]

2. On March 12, 2014 – only three days after TelexFree changed its compensation plan to require actual VoIP sales, thereby triggering a wave of protests from promoters – Crosby closed two accounts in his name at JP Morgan Chase Bank ("Chase"). On April 9, 2014 – just four days before TelexFree filed for bankruptcy – an account at Chase in the name of "Randy and Sonya Crosby Marketing" was also closed. The Commission has not yet been able to identify the bank(s) to which Crosby transferred any remaining balances in the Chase accounts, and it has not yet been able to identify any other banks where Crosby has or had accounts. [*Id.*, ¶7.]

This pattern of suspicious transfers and recent account closings is a strong indication that De La Rosa and Crosby have been, and may continue to be, dissipating or concealing assets.

## CONCLUSION

For the foregoing reasons, the Commission requests that this Court issue a preliminary injunction, order freezing assets, and order for other equitable relief as to defendants De La Rosa and Crosby in the form submitted.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its attorneys,

/s/ Frank C. Huntington
Frank C. Huntington (BBO #544045)
Deena R. Bernstein (BBO #558721)
Kevin Kelcourse (BBO #643163)
Scott Stanley (NY Bar No. 4504601)
Boston Regional Office
33 Arch Street, 23rd Floor
Boston, MA 02110
Telephone: (617) 573-8960 (Huntington direct)
Facsimile: (617) 573-4590
E-mail: huntingtonF@sec.gov

Dated: April 24, 2014

## Certificate of Service

I, Frank C. Huntington, certify that on April 24, 2014, the foregoing Plaintiff's Memorandum of Law in Support of its Motion for a Preliminary Injunction, Order Freezing Assets, and Order for Other Equitable Relief as to Defendants De La Rosa and Crosby, as well as the Declarations of Claudio Gil and Jason Farrell, the Second Declaration of Mark Albers, the Third Declaration of Scott Stanley, and a proposed form of order were filed electronically with the Court. Notice will be sent by e-mail to counsel of record for the defendants through the Court's electronic filing system, and the filings may be accessed through the Court's system.

/s/ Frank C.Huntington
Frank C. Huntington