UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

SECURITIES AND EXCHANGE COMMISSION, )
          Plaintiff, )
v. ) Case No. 1:14-cv-11858-NMG
TELEXFREE, INC., )
TELEXFREE LLC, )
JAMES M. MERRILL, )
CARLOS N. WANZELER, )
STEVEN M. LABRIOLA, )
JOSEPH H. CRAFT, )
SANDERLEY RODRIGUES DE VASCONCELOS, )
SANTIAGO DE LA ROSA, )
RANDY CROSBY and )
FAITH R. SLOAN, )
          Defendants, )
and )
TELEXFREE FINANCIAL, INC., )
TELEXELECTRIC, LLC and )
TELEX MOBILE HOLDINGS, INC., )
         Relief Defendants. )

---

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR A PRELIMINARY INJUNCTION,
ORDER FREEZING ASSETS, AND
ORDER FOR OTHER EQUITABLE RELIEF AS TO
DEFENDANTS TELEXFREE, INC., TELEXFREE, LLC,
MERRILL, WANZELER, LABRIOLA, CRAFT, RODRIGUES AND SLOAN
AND THE RELIEF DEFENDANTS**

Plaintiff Securities and Exchange Commission ("the Commission") submits this memorandum of law in support of its motion for a preliminary injunction, order freezing assets, and order for other equitable relief as to defendants TelexFree, Inc. and TelexFree, LLC

(collectively, "TelexFree"), James Merrill, Carlos Wanzeler, Steven Labriola, Joseph Craft, Sanderley Rodrigues de Vasconcelos ("Rodrigues"), and Faith Sloan, and the relief defendants.

## INTRODUCTION

On April 16, 2014, Judge Casper entered an *ex parte* temporary restraining order, order freezing assets, and other equitable relief as to all defendants and relief defendants. The Court should now take two steps with respect to the parties named above. First, the Court should convert the April 16 order into a preliminary injunction (with ancillary equitable relief), because the Commission has made a sufficient showing that it is likely to succeed on the merits that Merrill, Wanzeler, Labriola and Craft, as officers and insiders of TelexFree, and Rodrigues and Sloan, as leading promoters of TelexFree, have been operating a Ponzi or pyramid scheme in which earlier investors are paid with money received from later investors. Second, the Court should continue the order freezing assets, because: (1) there is a pattern of recent transfers to the individual defendants, their affiliated entities, and the relief defendants, and (2) the defendants have failed to comply with the April 16 Order.

## STATEMENT OF FACTS

### A. The Defendants

TelexFree, Inc. is a Massachusetts corporation with its principal place of business in Marlborough, Massachusetts. Prior to February 2012, it was known as Common Cents Communications, Inc. ("Common Cents"), which was incorporated by Wanzeler, Merrill and Labriola in 2002. [April 15, 2014 Evidentiary Appendix ("App."), Exs. A-1 to A-3.] TelexFree, LLC is a Nevada corporation with its principal place of business at the same address in Marlborough. It was incorporated by Wanzeler, Merrill, and Carlos Costa (a resident of Brazil)

in July 2012. [*Id.*, Ex. A-4.] TelexFree purports to be in the business of selling long-distance telephone calling plans that use "voice over internet" ("VoIP) technology.

James M. Merrill, age 52, lives in Ashland, Massachusetts. [*Id.*, Ex. C-1, pp.14-15.] He is one of two co-owners of TelexFree, Inc. and TelexFree, LLC. [*Id.*, Exs. A-1 & A-4.]

Carlos N. Wanzeler, age 45, lives in Northborough, Massachusetts. [*Id.*, Ex. C-2, pp.12-13, 18-19.] He is the other co-owner of TelexFree, Inc. and TelexFree, LLC. [*Id.*, Exs. A-1 & A-4.]

Steven M. Labriola, age 53, lives in Northbridge, Massachusetts. [*Id.*, Ex. I-1.] He incorporated Common Cents with Merrill and Wanzeler in 2002. [*Id.*, Ex. A-3.] He is the sales director of TelexFree, with primary responsibility for working with the company's promoters. [*Id.*, Ex. C-1, pp.63-64.]

Joseph H. Craft, age 50, lives in Boonville, Indiana. He is a Certified Public Accountant with offices in Indiana and Kentucky. [*Id.*, Ex. I-2.] TelexFree hired him as its CPA in April 2012. He prepares TelexFree's annual reports and financial statements and has sometimes been referred to as its CFO. [*Id.*, Ex. C-1, pp.25, 61, 210-212; Ex. C-2, pp.120-125.]

Sanderley Rodrigues de Vasconcelos, age 42, previously lived in Revere, Massachusetts, and now lives in Davenport, Florida. [*Id.*, Ex. I-4.] He is one of the most successful promoters of TelexFree, especially among the Brazilian community in Massachusetts and elsewhere. [*Id.*, Ex. C-2, pp.223-227.] He publicly claims to be the first U.S. promoter to become a millionaire. [Conforti Decl., ¶2.]

Faith R. Sloan, age 51, lives in Chicago, Illinois. [App., Ex. I-6.] Besides appearing in internet videos, she has promoted TelexFree through websites called "telexfreepower.com",

"telexfreeprogram.com" and "telexfree.faithsloan.com". [Second Huntington Decl., ¶3.]

### B. The Relief Defendants

TelexFree Financial, Inc. ("TelexFree Financial") is a Florida corporation with its principal place of business in Coconut Creek, Florida. It was incorporated by Craft on December 26, 2013. Its officers and directors are Wanzeler and Merrill, and Wanzeler is its registered agent. [App., Ex. A-11.]

TelexElectric, LLLP ("TelexElectric") is a Nevada limited partnership that purports to have its principal place of business in Las Vegas, Nevada. It was formed on December 2, 2013. Its general partners are Wanzeler and Merrill. [*Id.*, Ex. A-12.]

Telex Mobile Holdings, Inc. ("Telex Mobile") is a Nevada corporation that purports to have its principal place of business in Las Vegas, Nevada. It was incorporated on November 26, 2013. Its officers are Wanzeler and Merrill. [*Id.*, Ex. A-13.]

### C. TelexFree's Investment Program

#### 1. Promotional Activities

TelexFree purports to be in the business of providing VoIP service that costs $49.90 per month. It is no secret, however, that the primary business of TelexFree is recruiting new investors and paying them to promote the company by placing internet ads and recruiting more investors. As Merrill stated in a press release dated March 1, 2013:

> In addition to providing an excellent service at a very reasonable price, the real "secret sauce" of our success is our compensation plan. We have developed a unique system which allows every one of our independent representative [sic] the ability to make money every week. We actually pay our representatives weekly if they follow our system and advertise our service on the Internet.

4

[App., Ex. F-1.] To reach prospective investors, TelexFree has relied on its company website, websites maintained by leading promoters, and promotional videos posted on internet sites such as "YouTube". [Conforti Decl., ¶¶2-7; Huntington Decl., ¶5; Second Huntington Decl., ¶¶2-3.]

### 2. Membership Options

TelexFree charges $50 for an investor to become a "member" or "partner". [App., Ex. C-1, p.76; Ex. H-3, §5.1.] Until it changed its compensation plan on March 9, 2014,[1] TelexFree had two membership options:

1. The "AdCentral" program cost $339 ($50 membership fee plus $289 contract fee) for a 52-week contract. Investors received ten one-month packages of the VoIP service and were required to place one internet ad per day. For each week that they placed the ads, they received one additional VoIP package. Investors who posted the ads were promised a weekly $20 payment, or $1,040 for the year (*i.e.*, an annual return of 207% on an investment of $339).

2. The "AdCentral Family" program cost $1,425 ($50 membership fee plus $1,375 contract fee) for a 52-week contract. Investors received fifty one-month packages of VoIP service and were required to place five internet ads per day. For each week that they placed the ads, they received five additional VoIP packages. Investors who posted the ads were promised a weekly $100 payment, or $5,100 for the year (*i.e.*, an annual return of 265% on an investment of $1,425).

[App., Ex. C-1, pp.76-77, 150-152; Ex. C-3, pp.38-39, 43-44; Ex. C-4, pp.44-45, 48-49; Ex. G-1, pp.19-21; Ex. G-2, pp.9-10; Ex. H-3, §2.2.2.1, §5.4 & §5.5; Conforti Decl., ¶2, #1; Second

---

[1] The changes announced on March 9, 2014 are discussed in Section C below.

Huntington Decl., Ex. A, pp.13, 16.]

### 3. The Incentives for Investors

TelexFree employed a multi-level marketing structure in two respects. First, there were incentives for recruiting new AdCentral investors:

1. A one-time bonus of $20 for each new AdCentral investor and $100 for each new AdCentral Family investor they recruited.

2. A bonus of $20 for each direct or indirect participant in an investor's "network", up to a maximum of $440, as long as the investor recruited two additional AdCentral investors.

3. 2% of all payments to each AdCentral participant in an investor's network who had at least once active VoIP customer (which could be the participants themselves), down to six levels of the promoter's network.

4. 2% of TelexFree's net monthly billing, up to a maximum of $39,600, for an AdCentral Family investor who recruited ten new AdCentral Family investors, each of whom sold five VoIP packages (to themselves or to others).

[App., Ex. C-1, pp.78-79, 139-140, 157-158; Ex. C-5; Ex. G-1, pp.25-29, 32; Ex. G-2, pp.12, 17; Ex. H-3, §5.7, §5.8 & §6.1; Second Huntington Decl., Ex. A, pp.17-18.]

Second, there were incentives for sales of the VoIP service:

1. 90% (or $44.90) for the initial sale of a VoIP package (priced at $49.90) to a retail customer they recruited.

2. 10% (or $4.99) per month for each direct participant who renewed the VoIP service and 2% (or $0.99) per month for each indirect participant who renewed

6

      the VoIP service, down to six levels of the investor's network.

3.     2% of all sales of VoIP packages by direct or indirect participants in the investor's network, down to six levels.

[App., Ex. C-1, pp.76-78, 147-148, 152-156; Ex. C-4, pp.41-42; Ex. C-5; Ex. G-1, p.30; Ex. G-2, pp.8-9, 16; Ex. H, §7.1 & §9.1.2; Conforti Decl., ¶3, #4; Second Huntington Decl., Ex. A, p.17.]

### 4. The TelexFree "Back Office"

New investors could pay by credit card, or they could pay the investor who recruited them (whose internal account with TelexFree would be debited for the fee). New investors signed up through their promoter's page on the internal portion of the TelexFree website (referred to as the "back office") and received a personal log-in number. Promoters received their own page in the "back office", so that they could keep track of payments to and from participants in their network who purchased AdCentral memberships or the VoIP service. [App. Ex. C-1, pp.80-82; Ex. C-2, pp.48-57; Ex. C-3, pp.58-59.]

### 5. The Sole Requirement for Getting Paid: Posting Internet Ads

Prior to the March 9 rule change, TelexFree and its promoters emphasized that AdCentral investors did not have to sell the VoIP service or anything else – they simply had to select ads available on the "back office", copy the ads onto internet sites identified by the company (a task that took only minutes), and "validate" the ads in the "back office".

1.     One of the marketing presentations that appeared on the company's website was entitled "TelexFREE: Advertise & Technology." The presentation proclaimed, "Work over the Internet Posting ads daily." Only one slide mentioned the VoIP service; the rest described the various membership and commission programs in

detail. [App., Ex. C-5.]

2. Another version of the marketing presentation explained the three basic steps: "1. Choose ad. 2. Publishing Spaces. 3. Validate Your Ad." [*Id.*, Ex. G-1, pp.11-13.] It also stated, "TelexFree turnkey marketing system makes internet advertising simple & duplicatelable [sic]." [*Id.*, p.17.]

3. When telling his success story in an internet video posted on March 13, 2013, Rodrigues stated, "Just place your ads every day and everyone gets paid weekly." He also asked and answered the following question: "What company in the country, in the world, you can make money ... you don't need to sell anything? Now it exists. TelexFree." [Conforti Decl., ¶2, ##5-6.]

4. A website associated with Sloan stated on March 28, 2013, "NO SPONSORING REQUIRED. JUST PLACE ADS!" [Second Huntington Decl., Ex. A, p.9.] The website continued, "You just place your Ad and get paid weekly regardless of if anyone buys what you are selling or if you ever recruit a single person into this opportunity or not." [*Id.*, Ex. A, p.21.]

5. Sloan stated in an internet video posted on June 12, 2013, "You post your ads. Take you a minute and a half. Three minutes. Five minutes max... Place your ads, and you go about your day. You do that for seven days a week, you get paid every single week... You don't have to build. You don't have to sell." [*Id.*, ¶2.]

In fact, promoters who wanted to place many ads per day could use third-party services that automated the process of posting and validating the ads for a small fee. [App., Ex. C-3, pp.41-42; Ex. C-4, pp.68-69; Exs. E-8 & E-9.]

### 6. The Prospect of Getting Very Rich

TelexFree and its promoters proclaimed that investors who posted ads and recruited more investors could receive substantial amounts of money:

1. One version of the marketing presentation on the company's website contained a slide showing how an AdCentral investor could "Earn Income Down to Infinity." [App., Ex. G-1, p.24.]

2. Another version of the marketing presentation stated that an AdCentral investor could clear $2,296 per year on a $289 investment, an AdCentral Family investor could clear $11,599 per year on a $1,375 investment, and a "Team Builder" could receive as much as $39,600 per year. [*Id.*, Ex. C-5.]

3. A website associated with Sloan stated on March 28, 2013, "TelexFree Has Created Millionaires In Brazil In Just 15 Months!" [Second Huntington Decl., Ex. A, p.23.]

4. Wanzeler stated in a videotaped presentation on July 27, 2013, "Everybody in this room make money." [Conforti Decl., ¶4, #6.]

5. Labriola stated in a January 29, 2014 video, "There are some people that are making incredible money in this." [*Id.*, ¶6, #3.]

### C. Collapse of the Scheme

On March 9, 2014, TelexFree changed its compensation plan so that investors could not receive any payments until they actually sold the VoIP service. [App., Ex. C-1, pp.68-70, 103-105, 110-111; Ex. C-2, pp.48-49.] The rule change generated a storm of protests. On April 1, dozens of investors descended on the company's office in Marlborough to complain – in part

because, as one investor told the press, the VoIP service is "almost impossible to sell". [*Id.*, Ex. F-3.]

Late on Sunday, April 13, defendants TelexFree, Inc. and TelexFree, LLC and relief defendant TelexFree Financial filed for bankruptcy in Nevada under Chapter 11, claiming to have liabilities of as much as $600 million but assets of no more than $120 million.[2] [*Id.*, Exs. B-1, B-2 & B-3.] The companies stated that, in the five weeks after the March 9 rule change, promoters tried to withdraw $174 million, primarily commissions for AdCentral recruiting. [*Id.*, Ex. B-4, ¶35.] They admitted that sales of the VoIP service are too small for them to meet their obligations. [*Id.*, ¶¶30, 37.]

## ARGUMENT

### I. The Standard for Entering a Preliminary Injunction

The Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") provide that, in a Commission enforcement action, a court shall enter a temporary restraining order or preliminary injunction "upon a proper showing". 15 U.S.C. §77t(b); 15 U.S.C. §78u(d)(1); *see also Aaron v. SEC*, 446 U.S. 680, 688-689 (1980). A proper showing requires "a likelihood of success on the merits, a risk of irreparable harm, a favorable balance of equities, and that the injunction would be in the public interest." *SEC v. Fife*, 311 F.3d 1, 8 (1st Cir. 2002), *cert. denied*, 538 U.S. 1031 (2003). A court has broad discretion to consider evidence by affidavit, rather than live testimony, when deciding whether to enter a preliminary injunction. *Rice v. Wells Fargo Bank, N.A.*, 2014 WL 868785, *4 (D.Mass. March 5, 2014).

---

[2] The Commission has filed a motion for a change of venue to Massachusetts.

## II. The Commission Has Made the Necessary Showing for a Preliminary Injunction

### A. Likelihood of Success on the Merits

#### 1. TelexFree's Fraudulent Scheme

Based on the information available to date, TelexFree's VoIP revenue has been only a small fraction of the money it promised to pay to AdCentral investors. Credit card transactions from August 2012 to March 2014 show that TelexFree received slightly more than $1.3 million from the sale of approximately 26,300 VoIP contracts. During the same period, TelexFree received more than $302 million from approximately 250,000 AdCentral or AdCentral Family investors. Through the sale of those one-year AdCentral contracts, TelexFree promised to pay more than $1.1 billion to investors who placed the required internet ads. [Albers Decl., ¶7.] In other words, the receipts from selling VoIP packages covered barely 1% of TelexFree's obligations to investors who placed the ads.[3]

The Commission will not repeat its previous arguments that the TelexFree investment program violates the antifraud provisions of the federal securities laws. The bottom line is that the TelexFree program has elements of both a Ponzi scheme (using money from later AdCentral investors to make payments to earlier AdCentral investors) and a pyramid scheme (offering commissions and other incentives for recruiting new AdCentral investors). The First Circuit has found that both types of scheme are "investment contracts" that violate Section 10(b) of the Securities Exchange Act and Rule 10b-5, as well as Section 17(a) of the Securities Act, because

---

[3] The disparity between TelexFree's VoIP revenues and its obligations to AdCentral investors was actually worse than that, because the $1.1 billion of estimated obligations does not include the commissions and incentives that TelexFree promised to pay to investors under the incentive programs described above.

11

of the failure to disclose that a collapse is inevitable when the supply of new investors dries up. *SEC v. SG Ltd.*, 265 F.3d 42, 49-51 (1st Cir. 2001).

In addition, Merrill, Wanzeler, and the TelexFree website have made material misrepresentations about their experience and the company's origins.

On July 27, 2013, Merrill told an investor meeting that he and Wanzeler had a "good business" back in 1988 that worked for "a lot of Fortune 500 companies." Wanzeler told the group, "We have a company since 1995. It's a VoIP product company." He also said that he had been operating a VoIP business in Brazil called Diskavontade since 1998. [Conforti Decl., ¶4, ##2-3, 8.] The statements are false. In 1988, Merrill was actually operating a small commercial cleaning business from his home. [App., Ex. C-1, pp.19-20.] He did not even meet Wanzeler until 1993, when he gave him a job in the cleaning business. [*Id.*, Ex. C-2, 18-19.] Merrill and Wanzeler founded Common Cents in 2002 to market "10-10" long-distance calling plans for WorldxChange – a service that had nothing to do with VoIP technology. [*Id.*, Ex. C-1, pp.45-48, 52-53, 62-63; Ex. C-2, pp.24-28.] Only in 2005 did Wanzeler start selling adapters with VoIP capability in Brazil under the name Diskavontade. [*Id.*, Ex. C-2, pp.29-31, 39-45.]

2. The "Founder" section of the TelexFree website includes a photo of Merrill standing in front of a large three-story building, with the caption "Mr. Merrill in front of the headquarters of Telexfree in the USA." [*Id.*, Ex. C-1, pp.119-121; Ex. C-5; Ex. H-2.] The use of the building photo is misleading. TelexFree, Inc. does not own or occupy the entire building. In fact, it originally shared a single suite (a receptionist, conference rooms, and cubicles) with many other companies. Only in December 2013 did it move into its own suite in a portion of the first

floor. TelexFree, LLC has no physical office at all, just a mailing address in Nevada. [*Id.*, Ex. C-1, pp.30-36, 58, 124.]

3. The "Founder" section of the TelexFree website states that Merrill received a B.A. in Economics from Westfield State University. [*Id.*, Ex. H-2.] The statement is false. Merrill dropped out of Westfield State after only two years. [*Id.*, Ex. C-1, pp.18-19, 86. 89.]

### 2. **The Defendants' State of Mind**

Section 10(b) of the Exchange Act and Rule 10b-5 and Section 17(a)(1) of the Securities Act require a showing of scienter – a mental state that embraces intent to deceive or defraud and that includes recklessness. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 38 (1st Cir. 2002); *Brumbaugh v. Wave Sys. Corp.*, 416 F.Supp.2d 239, 252 (D.Mass. 2006). However, the Commission need prove only negligence to prevail on its claims under Sections 17(a)(2) and (3) of the Securities Act. *Aaron v. SEC*, 446 U.S. 680, 695-97 (1980). By any standard, the Commission has made a strong showing that TelexFree and the individual defendants acted with the required state of mind.[4]

Merrill, Wanzeler, Labriola and Craft have been running the TelexFree investment program in the U.S. since early 2012. Rodrigues became a promoter in February 2012, and Sloan became a promoter in early 2013. The basic features of the program have all the hallmarks of a Ponzi and pyramid scheme:

1. AdCentral investors get paid to do nothing except post internet ads.[5]

---

[4] The scienter of persons who control a corporation may be imputed to the corporation. *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1089 n.3 (2nd Cir.1972).

[5] The internet ads are not for general distribution to the public, like classified ads in the Boston *Globe* or an advertisement on television. Rather, they are thousands of duplicate ads posted on

2. Investors get paid for recruiting new AdCentral investors who will also do nothing.

3. There is a real VoIP service, but AdCentral investors do not have to sell the service in order to get paid.

4. Investors can sell unsold VoIP packages back to the company for $20 each.

In short, this is an investment program that promises to pay investors every week, with annual returns over 200%, for doing nothing, and it promises to pay them more if they recruit other investors to do nothing. How could TelexFree and the individual defendants have touted this kind of investment program without knowing, being reckless in not knowing, or at least being negligent about the fact that VoIP revenues were very small and that the money to pay earlier AdCentral investors in AdCentral was coming from later investors?[6]

In June 2013, a state court in Brazil suspended the operations of a TelexFree affiliate and froze its assets in Brazil. [Ex. C-2, pp.108, 111-115.] In a video posted on June 20, 2013, Merrill, Wanzeler and Labriola sought to reassure promoters. Merrill stated, "Inquiries like this are very common in network marketing... We have such unbelievable growth that we're going to draw attention." Labriola stated, "These things happen to network marketing companies over and over again... Let's not worry about it." [Conforti Decl., ¶3, ##5-6, 8-9.] Merrill, Wanzeler and Labriola continued to promote TelexFree without disclosing that the Brazilian court had

---

obscure internet websites. The ads are not likely to help notify anyone about TelexFree, and anyone who does an internet search for "TelexFree" would find the company's own website.

[6] The answer to that question is even more difficult to fathom for defendant Rodrigues. In 2007, he settled Commission charges that he operated a pyramid scheme known as Universo FoneClub Corporation. He was permanently enjoined from selling unregistered securities, and he was ordered to pay approximately $1.8 million of disgorgement. [App., Ex. D.]

expressed concern that the company was operating a pyramid scheme.

Through TelexFree's internal "back office", Craft had access to detailed information about the source of TelexFree's revenues, and Rodrigues and Sloan had access to detailed information about payments to and from new AdCentral investors and new VoIP customers in their network. With this information, it is very likely that they knew, were reckless in not knowing, or at least were negligent about the fact that the vast majority of TelexFree's revenues came from AdCentral investors, not VoIP customers.

### B. Violations of the Temporary Restraining Order

The Commission has made a sufficient showing as to the remaining factors – the risk of irreparable harm to investors, the balance of equities, and the public interest – because, to varying degrees, all the defendants have violated the April 16 Order.

Paragraph V froze the assets of all defendants. After a period of inactivity, the TelexFree company website has been up and running again since April 25, 2014. [Fourth Stanley Decl., ¶2.] It appears that TelexFree and/or one or more of the individual defendants may be improperly using investor funds for that purpose.

Paragraph VI required the defendants to submit a written accounting within five days after service of the Order. None of the defendants has done so.

Paragraph VII required the defendants to repatriate any investor funds located outside the United States within five days after service of the Order. Wanzeler received more than $7.3 million from TelexFree in late December 2013 and wired $3.5 million to the Oversea-China Banking Corporation in Singapore on January 2, 2014. [Albers Decl., ¶6.] TelexFree, LLC sent $10,389,000 to an entity known as TelexFree Dominicana, SRL on April 3, 2014. [*Id.*, ¶8.] To

the Commission's knowledge, neither defendant has repatriated those funds to the United States.

Paragraph VIII prohibited the defendants from soliciting new investors or "promoters". Nevertheless, two defendants are invoking divine authority for their efforts to drum up new business for TelexFree:

1. In a YouTube video posted on April 16, 2014, Rodrigues announced:

   > I am never going to stop this. If I say to my network I will never stop this because it is in blood, DNA. And who started multi-level was God. If you want to learn, learn. If you want to frown, frown. God made binary, Adam and Eve, and told them to multiply. For me, it is given by God.

   [Fourth Stanley Decl., ¶3.]

2. Sloan's "telexfree.faithsloan.com" website currently contains a March 15, 2014 update about the March 9 change to the compensation plan. The update includes the comment: "NOTE: It is STILL NOT FINAL ... But it is Getting BETTER as Jesus said." [Second Huntington Decl., Ex. B, p.8.] The website also tries to reassure current promoters: "Legacy promoters will be transitioned to the new plan with specially crafted requirements allowing them the potential to earn even more than the previous plan." [*Id.*, p.10.]

## III. The Commission Has Made the Necessary Showing for Continuing the Asset Freeze

A court may order an asset freeze to effectuate the purposes of the federal securities laws and to ensure that wrongdoers do not profit from their unlawful conduct. *SEC v. Manor Nursing*, 458 F.2d 1082, 1103 (2nd Cir. 1972). As Judge Saris stated in *SEC v. Pinez*:

> In an SEC enforcement action, "[t]he ultimate remedies available to the court include disgorgement, restitution, and rescission," and it is well-established that "[t]o preserve a basis for such remedies, the court may impose an interim asset freeze."

16

989 F.Supp. 325, 336 (D.Mass. 1997), *rem'd on other grds.*, 157 F.3d 2 (1st Cir. 1998) (citations omitted). An asset freeze is crucial "because of the high risk that any remaining investment funds or proceeds thereof would be further depleted without such an order." *Fife*, 311 F.3d at 8.

The same four-part test for whether to enter a preliminary injunction also applies for whether to enter an asset freeze. *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 161 (1st Cir. 2004). One critical question is whether the Commission has shown a likelihood of success on the merits. As Judge Saris stated in *Pinez*:

> In the usual case, once the SEC has demonstrated a likelihood of success on the merits of its claim that a defendant has committed a violation of federal securities law, it can obtain an order that preserves the proceeds of such violation until it may be proven at trial...

989 F.Supp. at 336. As explained above, the Commission has made the required showing.

A second question is a risk of irreparable harm "where there is a strong indication that the defendant may dissipate or conceal assets." *Micro Signal Research Inc. v. Otus*, 417 F.3d 28, 31 (1st Cir. 2005). Because the defendants have not submitted the required accounting, the Commission does not yet have complete bank account information. However, documents available to date indicate:

1. Relief defendant TelexFree Financial received $4,105,000 from TelexFree, Inc. and TelexFree, LLC on December 30 and December 31, 2013. [Albers Decl., ¶6.]

2. Financial statements prepared by Craft indicate that TelexFree made a $2,022,329 "loan" to relief defendant TelexElectric. [App., Ex. C-2, p.184; Ex. C6.]

3. Financial statements prepared by Craft indicate that TelexFree made a $500,870 "loan" to relief defendant Telex Mobile. [*Id.*]

4. Merrill received $3,136,200 from TelexFree, Inc. and TelexFree, LLC on December 26 and December 27, 2013. [Albers Decl., ¶6.]

5. Wanzeler received $7,317,800 from TelexFree, Inc. and TelexFree, LLC on December 26 and December 27, 2013. [*Id.*]

6. Two companies controlled by Craft received more than $2,010,000 between November 19, 2013 and March 14, 2014. [*Id.*]

7. On April 11 (just before TelexFree filed for bankruptcy), Merrill and the wife of Wanzeler obtained cashier's checks in the total amount of $25,552,402. The checks are payable to TelexFree, LLC. [*Id.*]

This pattern of suspicious transfers (including the transfers to the relief defendants) is a strong indication that TelexFree and the individual defendants have been, and may continue to be, dissipating or concealing investor funds. Accordingly, the Court should continue the asset freeze as to all the defendants named in the present motion as well as the relief defendants.

## CONCLUSION

For the foregoing reasons, the Commission requests that this Court issue a preliminary injunction, order freezing assets, and order for other equitable relief as to defendants TelexFree, Inc., TelexFree, LLC, Merrill, Wanzeler, Labriola, Craft, Rodrigues and Sloan, and relief defendants TelexFree Financial, TelexElectric, and Telex Mobile, in the form submitted.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its attorneys,

/s/ Frank C. Huntington
Frank C. Huntington (BBO #544045)
Deena R. Bernstein (BBO #558721)
Kevin Kelcourse (BBO #643163)
Scott Stanley (NY Bar No. 4504601)
Boston Regional Office
33 Arch Street, 23rd Floor
Boston, MA 02110
Telephone: (617) 573-8960 (Huntington direct)
Facsimile: (617) 573-4590
E-mail: huntingtonF@sec.gov

Dated: April 30, 2014

## Certificate of Service

I, Frank C. Huntington, certify that on April 30, 2014, the foregoing Plaintiff's Memorandum of Law in Support of its Motion for a Preliminary Injunction, Order Freezing Assets, and Order for Other Equitable Relief as to Defendants TelexFree, Inc., TelexFree, LLC, Merrill, Wanzeler, Labriola, Craft, Rodrigues and Sloan and the Relief Defendants was filed electronically with the Court. Notice will be sent by e-mail to counsel of record for the defendants through the Court's electronic filing system, and the filings may be accessed through the Court's system.

In addition, a copy is being sent by overnight delivery to:

Sanderley Rodrigues de Vasconcelos
124 Woodmar Court
Davenport, FL  33837


/s/ Frank C.Huntington
Frank C. Huntington