Case 1:14-cv-11858-NMG Document 425 Filed 09/28/17 Page 1 of 53

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>TELEXFREE, INC.,<br>TELEXFREE, LLC,<br>JAMES M. MERRILL,<br>CARLOS N. WANZELER,<br>STEVEN M. LABRIOLA,<br>JOSEPH H. CRAFT,<br>SANDERLEY RODRIGUES DE VASCONCELOS,<br>SANTIAGO DE LA ROSA,<br>RANDY CROSBY and<br>FAITH R. SLOAN,<br><br>Defendants,<br><br>and<br><br>TELEXFREE FINANCIAL, INC.,<br>TELEXELECTRIC, LLLP and<br>TELEX MOBILE HOLDINGS, INC.,<br><br>Relief Defendants. | Case No. 1:14-civ-11858-NMG<br><br>JURY TRIAL DEMANDED |

**SECOND AMENDED COMPLAINT**

Pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, plaintiff Securities and Exchange Commission ("the Commission") submits this Amended Complaint alleging the following against defendants TelexFree, Inc., TelexFree, LLC, James M. Merrill, Carlos N. Wanzeler, Steven M. Labriola, Joseph H. Craft, Sanderley Rodrigues de Vasconcelos ("Rodrigues"), Santiago De La Rosa, Randy Crosby, and Faith R. Sloan, and relief defendants

TelexFree Financial, Inc., TelexElectric, LLLC, and Telex Mobile Holdings, Inc., and hereby demands a jury trial:

**PRELIMINARY STATEMENT**

1. This case involves a massive Ponzi and pyramid scheme operated by TelexFree, Inc. and TelexFree, LLC (collectively, "TelexFree") and the eight individual defendants: four principals of TelexFree and four prominent promoters. TelexFree is a "multi-level marketing" company with its headquarters in Marlborough, Massachusetts. It purports to be in the business of selling telephone service plans that use "voice over internet" ("VoIP") technology. From April 2012 to April 2014, TelexFree and its two owners Merrill and Wanzeler, assisted by company insiders Labriola and Craft and promoters such as Rodrigues, De La Rosa, Crosby and Sloan, raised more than $340 million from hundreds of thousands of investors worldwide, including many members of the Brazilian and Dominican immigrant communities in Massachusetts, through a fraudulent and unregistered offering of securities. (TelexFree publicly claims to have raised more than $1 billion from more than 700,000 investors.) The securities took the form of "memberships" that promised substantial returns – 200% per year or more – for becoming "promoters" of the business. TelexFree promised to pay investors for placing ads on obscure classified ad sites on the internet and recruiting other investors to do the same. The membership fees from investors constituted 99% of the monies taken in by TelexFree. Prior to March 9, 2014, TelexFree did not require investors to sell the VoIP service in order to qualify for payments.

2. Despite the misleading appearance of having a legitimate VoIP business, the defendants actually operated an elaborate Ponzi and pyramid scheme. Based on the information

Case 1:14-cv-11858-NMG Document 425-1 Filed 09/12/17 Page 3 of 53

available to date, TelexFree's revenues from retail VoIP sales – about $1.3 million in two years – were barely 0.1% of the amount needed to honor its promises to investors who placed internet ads – nearly *$1.1 billion*. As a result, in classic fashion, TelexFree paid its earlier investors, not with revenues from selling the VoIP service, but with money received from later investors.

3. TelexFree has been a money-making machine for the individual defendants. The company's financial records indicate that, from mid-November 2013 through mid-April 2014, TelexFree transferred approximately $33 million to the individual defendants, their family members, and companies they controlled (including the relief defendants). Several of the defendants used investor funds to support a lavish lifestyle of large homes and expensive cars. Tens of millions of investor funds received by TelexFree are presently unaccounted for.

4. The scheme collapsed beginning in March 2014. On March 9, 2014, TelexFree changed its compensation plan so that investors would now be required to sell the VoIP service in order to qualify for payments that had previously been promised to them. The change generated a storm of protests from investors who posted hostile comments on the internet. On April 1, dozens of investors descended on the company's office in Marlborough to complain – in part because, as one of them told the press, the VoIP service is "almost impossible to sell". On the evening of Sunday, April 13 – faced with investigations by state and federal authorities in Massachusetts – TelexFree filed for bankruptcy in Nevada under Chapter 11, admitting that it could not meet its obligations with its VoIP revenues and seeking to reject all its contracts with investors. (The bankruptcy case has since been transferred to Massachusetts.) On April 14, the Massachusetts Securities Division filed an enforcement action against TelexFree, Inc. and TelexFree, LLC. On April 15, federal agents executed search warrants at the company's office

in Marlborough and seized documents (including $38 million of cashier's checks) and the computer servers. Also on April 15, the Commission filed the complaint in this action, and the next day, the Court entered an *ex parte* temporary restraining order, order freezing assets, and order for other equitable relief. On April 24, federal authorities obtained numerous warrants to seize property representing proceeds from the TelexFree scheme. On May 9, a federal criminal complaint was filed against Merrill and Wanzeler, charging them with conspiracy to commit wire fraud. Merrill is currently in custody; Wanzeler has fled the country.

5. Through the activities alleged in this Amended Complaint, the defendants have engaged in: (a) fraudulent or deceptive conduct in connection with the purchase or sale of securities, in violation of Section 10(b) of the Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; (b) fraud in the offer or sale of securities, in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act"); and (c) the offer or sale of unregistered securities, in violation of Section 5 of the Securities Act. In addition, Merrill and Wanzeler violated Section 20(a) of the Exchange Act as control persons of TelexFree, Inc. and TelexFree, LLC.

6. The Commission seeks: (a) a permanent injunction prohibiting the defendants from further violations of the relevant provisions of the federal securities laws; (b) disgorgement of the defendants' and relief defendants' ill-gotten gains, plus pre-judgment interest; and (c) civil penalties due to the egregious nature of the defendants' violations.

## **JURISDICTION**

7. The Commission seeks a permanent injunction and disgorgement pursuant to Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d)(1) of the Exchange Act

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 5 of 53

[15 U.S.C. §78u(d)(1)]. The Commission seeks the imposition of civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

8. The Court has jurisdiction over this case pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§77t(d), 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa]. Venue is proper in this District because TelexFree, Inc. and TelexFree, LLC have their principal place of business in Massachusetts, and Merrill, Labriola and De La Rosa live in Massachusetts. (Until recently, Wanzeler and Rodrigues also lived in Massachusetts.)

9. In connection with the conduct described in this Amended Complaint, the defendants directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

10. The defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

**DEFENDANTS**

11. TelexFree, Inc. is a Massachusetts corporation with its principal place of business in Marlborough, Massachusetts. Prior to February 2012, it was known as Common Cents Communications, Inc. ("Common Cents"), which was incorporated by Merrill, Wanzeler and Labriola in 2002. TelexFree, LLC is a Nevada limited liability company with its principal place of business at the same address in Marlborough. It was formed by Merrill, Wanzeler and Carlos Costa (a resident of Brazil) in July 2012, and it registered to do business in Massachusetts in

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 6 of 53

April 2013. On April 13, 2014, TelexFree, Inc. and TelexFree, LLC filed for bankruptcy under Chapter 11.

12. James M. Merrill, age 53, lives in Ashland, Massachusetts. He was a founder of Common Cents in 2002. He is a 50% co-owner of TelexFree, Inc. and TelexFree, LLC. At all relevant times, he was the president and a director of TelexFree, Inc. and a manager of TelexFree, LLC. He is also the owner of Cleaner Image Associates, Inc., a small commercial cleaning business that he has operated from his home in Ashland since 1986.

13. Carlos N. Wanzeler, age 45, lived in Northborough, Massachusetts, until April 15 (the day federal agents executed search warrants at TelexFree's office), when he left the country. He is now living in Brazil. He was a founder of Common Cents in 2002. He is a 50% co-owner of TelexFree, Inc. and TelexFree, LLC. At all relevant times, he was the treasurer and a director of TelexFree, Inc. and a manager of TelexFree, LLC. In addition, he was sometimes held out as TelexFree's vice president of technology.

14. Steven M. Labriola, age 53, lives in Upton, Massachusetts. He was a founding director of Common Cents in 2002. At all relevant times, he was the sales manager for TelexFree. He is also the owner of Gyver Work, a small computer repair and maintenance business located in Southborough, Massachusetts.

15. Joseph H. Craft, age 50, lives in Boonville, Indiana. He is a Certified Public Accountant with offices in Indiana and Kentucky. He was hired as TelexFree's accountant in April 2012, and he was sometimes held out as the company's CFO. He has also been the CFO of other multi-level marketing companies.

Case 1:14-cv-11858-NMG Document 425-1 Filed 09/12/17 Page 7 of 53

16. Sanderley ("Sann") Rodrigues de Vasconcelos ("Rodrigues"), age 42, previously lived in Revere, Massachusetts, and now lives in Davenport, Florida. At all relevant times, he was a prominent promoter of TelexFree, especially among the Brazilian immigrant community in Massachusetts and elsewhere. In 2007, he settled charges brought by the Commission for operating a fraudulent pyramid scheme known as Universo FoneClub. Pursuant to the settlement, he was permanently enjoined from selling unregistered securities and ordered to pay approximately $1.8 million of disgorgement.

17. Santiago De La Rosa, age 42, lives in Lynn, Massachusetts. At all relevant times, he was a prominent promoter of TelexFree, especially among in the Dominican immigrant community in Massachusetts and elsewhere.

18. Randy N. Crosby, age 51, lives in Alpharetta, Georgia. At all relevant times, he was a prominent promoter of TelexFree. He was previously a licensed insurance agent in Georgia, but his license has expired.

19. Faith R. Sloan, age 54, lives in Dolton, Illinois. At all relevant times, she was a prominent promoter of TelexFree.

**RELIEF DEFENDANTS**

20. TelexFree Financial, Inc. ("TelexFree Financial") is a Florida corporation with its principal place of business in Coconut Creek, Florida. It was incorporated by Craft on December 26, 2013 as a wholly-owned subsidiary of TelexFree, LLC. At all relevant times, its officers and directors were Merrill and Wanzeler, and its registered agent was Wanzeler. On April 13, 2014, it filed for bankruptcy under Chapter 11.

Case 1:14-cv-11858-NMG Document 425-1 Filed 09/12/17 Page 8 of 53

21. TelexElectric, LLLP ("TelexElectric") is a Nevada limited liability partnership that was formed by Craft on December 2, 2013. Its general partners are Merrill and Wanzeler.

22. Telex Mobile Holdings, Inc. ("Telex Mobile") is a Nevada corporation that was incorporated by Craft on November 26, 2013. Its officers are Merrill and Wanzeler.

## STATEMENT OF FACTS

### Background

23. Merrill met Wanzeler in 1993 and gave him a job in the cleaning business. In the late 1990s, Merrill and Wanzeler became sales agents for WorldxChange, one of many companies then offering inexpensive long-distance phone service through "10-10" access numbers. (To make a call, customers dialed the company's seven-digit access number and then dialed the phone number they wanted to reach.) WorldxChange was a multi-level marketing company that relied on sales agents to recruit other sales agents as well as customers. Merrill and Wanzeler recruited Labriola as one of their sales agents. In 2002, the three of them incorporated Common Cents as a vehicle for their sales efforts on behalf of WorldxChange. Wanzeler did most of the company's recruiting through his contacts in Brazil and the Brazilian community in Massachusetts. In 2003, however, the three stopped working for WorldxChange after it was acquired by another company and abandoned the multi-level marketing strategy.

24. In 2005, Wanzeler began selling analog telephone adapters – devices that link a traditional telephone line with a digital network or VoIP service. Most of his customers were in Brazil, and Wanzeler used the names "Disk-a-Vontade Telefonia" in Brazil and "Brazilian Help" in the United States. His promotional efforts consisted primarily of television and radio ads in Brazil, because an attempt to employ a multi-level marketing model was not successful, and the

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 9 of 53

adapters were mainly sold in neighborhood stores. In 2007, Wanzeler incorporated Brazilian Help, Inc. in Massachusetts.

25. In early 2012, Carlos Costa, who had been Wanzeler's top sales agent in Brazil, suggested that they recruit customers through ads on the internet. Wanzeler and Costa created Ympactus Comercial Ltda. ("Ympactus"), a Brazilian company that used the name "TelexFree" and marketed a VoIP service called "99TelexFree" for $49.90 per month.

26. At the same time, Merrill and Wanzeler began taking steps to bring "TelexFree" to the United States. In February 2012, they changed the name of Common Cents to TelexFree, Inc. In July 2012, Merrill, Wanzeler and Costa formed TelexFree, LLC. Wanzeler, Costa and associates in Brazil created a company website called "telexfree.com" that was translated from Portuguese into English. In April 2012, TelexFree began raising money from investors.

## The TelexFree Investment Program

### Reliance on Promotional Activities by Investors

27. TelexFree purported to be in the business of providing a VoIP service that cost $49.90 per month. Customers registered their phone numbers with TelexFree and received software that enabled their computers to place phone calls through the company's computer servers in Marlborough.

28. The primary business of TelexFree, however, was recruiting new investors and paying them to promote the company by placing internet ads and recruiting more investors. As Merrill stated in a press release dated March 1, 2013, "In addition to providing an excellent service at a very reasonable price, the 'secret sauce' of our success is our compensation plan...

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 10 of 53

We actually pay our representatives weekly if they follow our system and advertise our service on the Internet."

29. To reach prospective investors, TelexFree relied on the company website, websites operated by promoters, videos posted on the internet (primarily on the "YouTube" website), and large gatherings at hotels and resorts.

**Membership Options**

30. TelexFree charged $50 for an investor to become a "member" or "partner". Until it changed its compensation plan on March 9, 2014, TelexFree had two membership options:

a. "AdCentral": $339 for a one-year contract ($50 membership fee plus $289 contract fee). Investors received ten one-month packages of the VoIP service at the outset and were required to place one internet ad per day. For each week they placed all the ads, they received one more VoIP package. Investors who posted the ads were promised $20 per week, or $1,040 for the year (*i.e.*, a return of 207% on an investment of $339).

b. "AdCentral Family": $1,425 for a one-year contract ($50 membership fee plus $1,375 contract fee). Investors received fifty one-month packages of VoIP service at the outset and were required to place five internet ads per day. For each week they placed all the ads, they received five more VoIP packages. Investors who posted the ads were promised $100 per week, or $5,200 for the year (*i.e.*, a return of 265% on an investment of $1,425).

**Incentives for Investors**

31. TelexFree had a multi-level marketing structure, with several bonus plans for investors who recruited new investors:

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 11 of 53

a. $20 for each new AdCentral investor and $100 for each new AdCentral Family investor.

b. $20 for each investor (or "member") in an investor's "network", up to a maximum of $440, as long as the investor had recruited two members (thereby creating a "binary" network structure).

c. 2% of all payments to each member in an investor's network with at least one VoIP customer (which could be the members themselves), down to six "levels".

d. 2% of TelexFree's net monthly billing, up to a maximum of $39,600, for an AdCentral Family investor who recruited ten new AdCentral Family members, each of whom sold five VoIP packages (to themselves or to others).

32. TelexFree also offered commissions for selling the VoIP service:

a. 90% (or $44.90) for the initial sale of a monthly VoIP package at $49.90.

b. 10% (or $4.99) per month for each direct member who renewed the monthly VoIP service and 2% (or $0.99) per month for each indirect member who renewed the service, down to six levels of the investor's network.

c. 2% of all sales of the VoIP service by direct or indirect members in an investor's network, down to six levels.

33. New investors in AdCentral could pay by credit card, or they could pay the promoter who recruited them. (Some promoters forwarded the investors' funds to TelexFree; others kept the investors' funds and told TelexFree to debit their internal account with the company.) New investors signed up through their promoter's page on the internal portion of the company website (referred to as the "back office") and selected a personal log-in and password.

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 12 of 53

(Each contract required a separate log-in.) Promoters received their own page in the "back office", so that they could keep track of their accrued weekly payments, bonuses for recruiting new members, and any sales of the VoIP service. Investors could submit requests to withdraw some or all of their accrued balance (up to $10,000 per month), and the company made payments to investors by check or through a payment processing service.

34. New retail customers for the VoIP service could pay by credit card, check or cash. By contrast, when existing investors "purchased" the VoIP service, they typically "paid" by having TelexFree debit their internal account for the $49.90 monthly charge. In other words, VoIP "sales" to existing investors did not generate additional cash for TelexFree – they merely reduced the accrued payments to which the investor was entitled.

**<u>The Sole Requirement for Getting Paid: Posting Meaningless Internet Ads</u>**

35. Before the compensation plan was changed on March 9, 2014, there was no requirement that AdCentral investors actually sell the VoIP service in order to receive the promised weekly payments. The only requirement for receiving the payments was to post internet ads (one per day for each AdCentral contract and five per day for each AdCentral Family contract).

36. The ads were written by TelexFree and available on the "back office" portion of the company website. The ads offered a 60-minute free trial of the VoIP service. The "back office" contained links to external websites where the ads could be posted. Using a computer, the investor copied the ad, pasted it on the external website, and returned to the "back office" to "validate" that the ad had been posted. As a marketing presentation on the company website summarized the process: "1. Choose ad. "2. Publishing Spaces. 3. Validate Your Ad." In fact,

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 13 of 53

promoters who wanted to post many ads per day could use third-party services that automated the posting and validating process for a small fee.

37. Unlike television or newspaper ads, the TelexFree ads were not aimed at the general public. Instead, the ads were placed primarily on websites dedicated to classified ads. In early April 2014, one website (Adpost.com) contained more than 33,000 ads for TelexFree, while another (ClassifiedsGiant.com) contained more than 25,000 ads posted in the past two months. The most likely way for someone to encounter the ads was through an internet search for the word “telexfree”, but that search would also lead straight to the company website. In other words, the thousands of virtually identical ads were essentially meaningless as a way to notify the public about TelexFree and promote sales of the VoIP service. As TelexFree’s interim CEO, with fifteen years of experience with multi-level marketing companies, told a bankruptcy court hearing on May 2, “we had no way to define whether the ads we were placing were actually causing the revenue, and to me that just doesn’t make sense.”

38. The complete lack of any requirement to sell the VoIP service was underscored by the statements made by TelexFree insiders and promoters that the weekly payments to investors ($20 for each AdCentral contract and $100 for each AdCentral Family contract) reflected the company’s “repurchase” (at $20 each) of the VoIP packages they received each week for each contract. In fact, the “back office” also had a specific page for investors to submit requests for the company to repurchase VoIP packages.

**<u>The TelexFree Investment Program Was a Ponzi and Pyramid Scheme</u>**

39. In June 2013, a Brazilian state court suspended the operations of Ympactus, TelexFree's affiliate in Brazil, and froze $100 million of its assets, based on suspicions that it was operating a pyramid scheme.

40. After the enforcement action in Brazil, the leaders of TelexFree publicly claimed that TelexFree was different from illegal multi-level marketing programs, because it had an actual product to sell – the VoIP service.

a. Merrill, Wanzeler and Labriola can be heard on a slide presentation that was posted on YouTube on June 20, 2013 with the title "TelexFREE Investigation with President James Merrill, Vice President Carlos Wanzeler + Steve Labriola." All three tried to downplay the significance of the enforcement action in Brazil. Merrill stated, "Inquiries like this are very common in network marketing." Wanzeler stated, "Our company is different from any other network marketing." Labriola stated, "These things happen to network marketing companies over and over again."

b. Gerald Nehra, who is identified on the company website as TelexFree's attorney, appeared in a video that was posted on YouTube on August 2, 2013 with the title "TelexFREE Lawyer". Nehra stated, "The special ingredient is that you have a real product."

c. Carlos Costa appeared in a video that was posted on YouTube on August 15, 2013 with the title "TelexFREE: Carlos Costa Proves TelexFREE is Not an Illegal Pyramid." Costa stated that TelexFree "never was, never will be" an illegal pyramid because it sells the VoIP service. He added:

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 15 of 53

> People will pay the monthly fee [for the VoIP service]. That sustains our business.
>
> We do not depend on everyone coming in in order to pay the people who are already in.

41. The reality was quite different, for two reasons. First, the basic features of the TelexFree investment program had all the hallmarks of a Ponzi and pyramid scheme: (1) investors were promised unusually high returns – over 200% per year – for doing virtually nothing (except posting meaningless internet ads); (2) investors were promised bonuses if they recruited new investors, who would do virtually nothing except post ads and recruit new investors (and so on and so on); and (3) there was an actual VoIP service, but investors did not have to sell the service in order to get paid. Because investors were strongly encouraged to recruit new investors and were not required to sell the VoIP service, the almost inescapable inference is that TelexFree was using funds from later investors to pay earlier investors.

42. Second, the information available to date confirms that the revenues from retail VoIP sales were only a tiny fraction of the money TelexFree promised to pay to AdCentral investors. Credit card and banking transactions indicate that, from August 2012 to March 2014, TelexFree received slightly more than $1.3 million from the retail sale of approximately 26,300 monthly VoIP contracts. During the same period, TelexFree received more than $340 million from hundreds of thousands of investors who purchased AdCentral or AdCentral Family contracts. Through the sale of those one-year contracts, TelexFree effectively promised to pay more than *$1.1 billion* to the investors who posted the required ads – a task which, as explained above, was extremely easy to perform. In other words, the revenues from retail VoIP sales covered barely 0.1% of TelexFree's obligations to pay AdCentral investors who placed ads. The

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 16 of 53

disparity between TelexFree's retail VoIP revenues and its obligations to AdCentral investors was even worse than that, because the figure of $1.1 billion does not include the bonuses and commissions that TelexFree also promised to pay investors, as described above.

43. In short, Merrill and Wanzeler, in concert with the other individual defendants, were running a huge Ponzi and pyramid scheme. Because retail VoIP revenues were so small, TelexFree used money from later investors to make its payments to earlier investors.

44. The sheer volume of transactions between TelexFree and investors, many in small dollar denominations, raised concerns at the banks and credit card payment processors that TelexFree used. One bank after another – Bank of America, TD Bank, Citizens Bank, Fidelity Co-Op Bank, Wells Fargo, and Middlesex Savings Bank – ultimately terminated their banking relationships with TelexFree. Several payment processors – PayPal, ProPay, Global Payroll Gateway, i-Payout, and Allied Wallet – likewise terminated their relationships with TelexFree.

**Collapse of the TelexFree Investment Program**

45. On March 9, 2014, Merrill, Wanzeler, Labriola, De La Rosa and Crosby appeared at a conference at the Marriott Copley Place Hotel in Boston to announce that TelexFree was changing its compensation plan. Under the new plan, investors could not receive any payments unless they actually sold five monthly VoIP packages. (When it filed for bankruptcy one month later, a representative of TelexFree stated that the company adopted the new compensation plan after "questions" had been raised about the old plan.") Wanzeler, Labriola, De La Rosa and Crosby also appeared in videos touting the supposed benefits of the new plan. Nevertheless, the new plan generated a storm of protests from investors, many of whom posted angry internet messages or videos. On April 1, dozens of investors descended on the company's office in

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 17 of 53

Marlborough to complain – in part because, as one investor told the press, the VoIP service is "almost impossible to sell".

46. Late on Sunday, April 13, defendants TelexFree, Inc. and TelexFree, LLC and relief defendant TelexFree Financial filed for bankruptcy in Nevada under Chapter 11, claiming to have liabilities of as much as $600 million but assets of approximately $100 million. (The bankruptcy case has since been transferred to Massachusetts.) TelexFree stated that, in the five weeks after the compensation plan was changed, investors tried to withdraw $174 million from their accounts with the company, primarily for commissions from AdCentral recruiting. The company admitted that, after March 9, payments to investors "quickly became a substantial drain on the Company's liquidity." It also admitted that VoIP sales under the new plan "have been disappointing" and "do not allow the Company to meet its obligations."

47. On April 14, the Massachusetts Securities Division filed an enforcement action against TelexFree, Inc. and TelexFree, LLC.

48. On April 15, federal agents executed search warrants at TelexFree's office and a nearby data center in Marlborough. They seized documents (including $38 million of cashier's checks that had been obtained in the preceding few days), the company's computer servers in Marlborough, and the company's computer servers in Fort Worth, Texas. The same day, Wanzeler left the country by driving to Canada.

49. Also on April 15, the Commission filed the complaint in this action. On April 16, the Court entered an *ex parte* temporary restraining order, order freezing assets, and order for other equitable relief as to all defendants and relief defendants.

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 18 of 53

50. On April 24, federal authorities obtained warrants to seize property representing proceeds from the TelexFree scheme.

51. On May 9, a federal criminal complaint was filed against Merrill and Wanzeler, charging them with conspiracy to commit wire fraud. Merrill is currently in custody; Wanzeler has fled the country.

**Actions of the TelexFree Owners**

**James Merrill**

52. Prior to the bankruptcy filings on April 13, 2014, Merrill was the president and a director of TelexFree, Inc., a co-manager of TelexFree, LLC, and an officer and director of TelexFree Financial. On April 17 – after those three companies filed for bankruptcy, the Massachusetts Securities Division filed its enforcement action, federal agents executed search warrants at TelexFree's office, and the Commission filed the complaint in this case – the recently-appointed interim CEO of TelexFree forced Merrill to resign from his positions with the companies. However, Merrill still owns 50% of the three companies, directly or indirectly.

53. Merrill was one of the main public faces of TelexFree. He was quoted in the company's press releases. His picture and biography appeared on the company website under the heading "Founder". He attended many promotional events for TelexFree. Some of the promotional events were videotaped, and the videos were posted on YouTube.

54. The "Founder" section in the public portion of the TelexFree website stated that Merrill received a B.A. in Economics from Westfield State University. Merrill knew that the statement was materially false and misleading, because he dropped out of Westfield State after

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 19 of 53

only two years and took a job in janitorial services. Despite being the company's president, Merrill failed to take effective action to prevent or correct the misstatement.

55. The "Founder" section of the company website also included a photo of Merrill standing in front of a large three-story building, with the caption "Mr. Merrill in front of the headquarters of Telexfree in the USA." Similarly, marketing presentations on the company website contained a slide with a photo of Merrill and a photo of the same building with the caption "The Company HQ: United States." Merrill knew, was reckless in not knowing, or was negligent about the fact that the photo captions were materially false and misleading, because: (a) TelexFree, Inc. does not own or occupy the entire building; (b) TelexFree, Inc. originally shared a single suite (consisting of a receptionist, conference rooms, and cubicles) with many other companies; (c) only in December 2013 did TelexFree, Inc. move into its own suite in a portion of the first floor; and (d) TelexFree, LLC has no physical office at all, just a mailing address in Nevada. Despite being the company's president, Merrill failed to take effective action to prevent or correct the misstatements.

56. On March 1, 2013, TelexFree issued a press release that included a quote from Merrill:

> In addition to providing an excellent service at a very reasonable price, the real "secret sauce" of our success is our compensation plan. We have developed a unique system which allows every one of our independent representative [sic] the ability to make money every week. We actually pay our representatives weekly if they follow our system and advertise our service on the Internet.

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 20 of 53

57. Merrill can be heard on the YouTube video that was posted on June 20, 2013, shortly after Brazilian authorities had shut down Ympactus, TelexFree's affiliate in Brazil. In the video, Merrill made reassuring statements about the Brazilian enforcement action:

> We understand your concerns.
>
> It does not affect the U.S. market. We're still growing like crazy, thanks to your efforts.
>
> Inquiries like this are very common in network marketing.
>
> We have such unbelievable growth that we're going to draw attention.

Merrill knew, was reckless in not knowing, or was negligent about the fact that his statements were materially false and misleading, because he failed to disclose that the Brazilian authorities were concerned that Ympactus, whose activities were virtually identical to those of TelexFree, was operating an illegal pyramid scheme.

58. Merrill attended a large gathering of investors and promoters in California on July 27, 2013. Portions of the event were videotaped. Merrill can be seen in a video that was posted on YouTube on August 1, 2013 with the title "TelexFREE Corporate Speakers at Newport Beach Extravaganza July 27, 2013." In the video, Merrill stated:

> Carlos and I in that business back in '88, we had a good business going. OK? It was a business-to-business business. We worked for a lot of corporations, a lot of Fortune 500 companies.

Merrill knew that his statements were materially false and misleading, because: (a) in 1988, he was actually operating a small commercial cleaning business from his home; (b) he did not even meet Wanzeler until 1993, when he gave Wanzeler a job in the cleaning business; and (c) he and

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 21 of 53

Wanzeler founded Common Cents in 2002 to market "10-10" long-distance calling plans for WorldxChange – not to work for "a lot of Fortune 500 companies".

59. On March 9, 2014, Merrill appeared onstage at the event in Boston where TelexFree announced the new compensation plan that required each investor to have five VoIP customers. Merrill told the audience:

> You're gonna get paid.
>
> We are here to help you make money.

60. On March 21, 2014, TelexFree issued a press release that included a quote from Merrill: "We have been in VOIP telecommunications for more than a decade." Merrill knew that his statement was materially false and misleading, because the business of Common Cents, the predecessor of TelexFree, Inc. that was founded in 2002, was marketing "10-10" long-distance plans for WorldxChange – plans that had nothing to do with VoIP technology.

61. Merrill knew that investors were strongly encouraged to recruit new investors and were not required to sell the VoIP service, that authorities had shut down TelexFree's affiliate in Brazil as an illegal pyramid scheme, and that numerous banks and payment processors had terminated their relationships with TelexFree. He knew, was reckless in not knowing, or was negligent about the fact that TelexFree derived virtually no revenue from retail VoIP sales, while 99% of its income came from investors in AdCentral. As a result, Merrill knew, was reckless in not knowing, or was negligent about the fact that his public statements promoting TelexFree, including those quoted in the previous paragraphs, were materially false and misleading and, more generally, that his promotional activities on behalf of TelexFree were fraudulent and deceptive, because TelexFree was a Ponzi and pyramid scheme that was destined to collapse,

thereby preventing it from making the payments promised to investors. As an officer and director, Merrill's state of mind can be attributed to TelexFree, Inc. and TelexFree, LLC.

**Carlos Wanzeler**

62. Prior to the bankruptcy filings on April 13, 2014, Wanzeler was the treasurer and a director of TelexFree, Inc., a co-manager of TelexFree, LLC, and an officer and director of TelexFree Financial. On April 17 – after those three companies filed for bankruptcy, the Massachusetts Securities Division filed its enforcement action, federal agents executed search warrants at TelexFree's office, and the Commission filed the complaint in this case – the recently-appointed interim CEO of TelexFree tried to force Wanzeler to resign from his positions with the companies. Wanzeler refused, so the interim CEO terminated him as an officer and agent of the companies. However, Wanzeler remains a director or manager (as applicable) of the companies, and he still owns 50% of the three companies, directly or indirectly.

63. Wanzeler was one of the main public faces of TelexFree. He attended many promotional events for TelexFree. Some of the promotional events were videotaped, and the videos were posted on YouTube.

64. Wanzeler can be heard on the YouTube video that was posted on June 20, 2013, shortly after Brazilian authorities had shut down Ympactus, TelexFree's affiliate in Brazil. In the video, Wanzeler made reassuring statements about the Brazilian enforcement action:

> I'm sure 99% we can fix these problems today or tomorrow.
>
> This is not going to affect us inside U.S. or any other country besides Brazil.

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 23 of 53

> Our company is different from any other network marketing.
>
> We're still here. We're going to stay here for a long time.

Wanzeler knew, was reckless in not knowing, or was negligent about the fact that his statements were materially false and misleading, because he failed to disclose that the Brazilian authorities were concerned that Ympactus, whose activities were virtually identical to those of TelexFree, was operating an illegal pyramid scheme.

65. Wanzeler can be seen in the video identified above showing portions of an event in California on July 27, 2013. In the video, Wanzeler stated:

> We have a company since 1995. It's a VoIP product company. OK? And we help, especially in the Brazilian market, call Brazil for incredible price.
>
> And we have a product like they can call unlimited calls to cell phones and fixed lines in Brazil and pay like $49.90 with a company I think a lot of people know about is Disk-a-Vontade. It's still there for 15 years.

Wanzeler knew that his statements about the origins of TelexFree were materially false and misleading, because: (a) in 1995, he and Merrill were working in Merrill's small commercial cleaning business; (b) when they founded Common Cents in 2002, they were in the business of marketing a "10-10" long-distance calling plan, not a VoIP service; and (c) he did not start doing business as "Disk-a-Vontade" until 2005, when he began selling telephone adapters in Brazil.

66. In the video of the California event, Wanzeler also stated:

> When you guys cannot sell that [VoIP] account, we give the opportunity you can sell it back to our company.
>
> Everybody in this room can make money.
>
> We have a great product.

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 24 of 53

67. On March 9, 2014, Wanzeler appeared onstage at the event in Boston where TelexFree announced the new compensation plan that required each investor to have five VoIP customers. Portions of the event were videotaped. Wanzeler can be seen in a video that was posted on YouTube on March 12, 2014 with the title "TelexFree Boston Conference – Compensation Plan Part 4." In the video, Wanzeler stated that someone had come to him and said, "Carlos, you don't ask for five customers for the old ones [AdCentral contracts]. We lose money. I want you teach everyone to have five customers." He also told the audience:

> We have a product and service no one else have; none of them.
>
> I don't want anybody to worry.

68. Wanzeler knew that investors were strongly encouraged to recruit new investors and were not required to sell the VoIP service, that authorities had shut down TelexFree's affiliate in Brazil as an illegal pyramid scheme, and that numerous banks and payment processors had terminated their relationships with TelexFree. Wanzeler knew, was reckless in not knowing, or was negligent about the fact that TelexFree derived virtually no revenue from retail VoIP sales, while more than 99% of its income came from investors in AdCentral. As a result, Wanzeler knew, was reckless in not knowing, or was negligent about the fact that his public statements promoting TelexFree, including those quoted in the previous paragraphs, were materially false and misleading and, more generally, that his promotional activities on behalf of TelexFree were fraudulent and deceptive, because TelexFree was a Ponzi and pyramid scheme that was destined to collapse, thereby preventing it from making the payments promised to

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 25 of 53

investors. As an officer and director, Wanzeler's state of mind can be attributed to TelexFree, Inc. and TelexFree, LLC.

**Actions of the Other TelexFree Insiders**

**Steven Labriola**

69. Prior to the bankruptcy filings on April 13, 2014, Labriola worked in TelexFree's office in Marlborough and was sometimes identified as its "director of international marketing" or "director of business development". He was responsible for TelexFree's relationships with its promoters and ran numerous training conferences. He was one of the main public faces of TelexFree, providing periodic "corporate updates" and appearing in other promotional videos that were posted on YouTube.

70. Labriola can be heard on the YouTube video identified above that was posted on June 20, 2013, shortly after Brazilian authorities had shut down Ympactus, TelexFree's affiliate in Brazil. In the video, Labriola made reassuring statements about the Brazilian enforcement action:

> We're still planning here to keep on rolling forward.
>
> These things happen to network marketing companies over and over again.
>
> We have a great road ahead of us all. Let's not worry about it.

Labriola knew, was reckless in not knowing, or was negligent about the fact that his statements were materially false and misleading, because he failed to disclose that the Brazilian authorities were concerned that Ympactus, whose activities were virtually identical to those of TelexFree, was operating an illegal pyramid scheme.

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 26 of 53

71. Labriola spoke during a slide presentation that was hosted by Crosby and posted on YouTube on July 22, 2013 with the title "Special TelexFREE CORPORATE CALL Steve Labriola." In the video, Labriola stated:

> Absolutely we have products that can change your life.
>
> There's not another company on the planet that will pay the amount of money that we pay out.
>
> I haven't found one reason at all why this business might not be for anyone.
>
> There is no limit to network marketing.

72. Labriola spoke during a slide presentation that was hosted by Crosby and posted on YouTube on January 29, 2014 with the title "TelexFREE Steve Labriola Corporate Update Call 1/29/14." In the video, Labriola stated:

> We are not an investment company. We are a products and service company that pays agents to use, sell and promote our services.
>
> It's all about getting customers. We want to be around for the next fifty-plus years. We want to keep growing. We want to keep moving forward. And the way that we can do that is by selling products and services.
>
> There are people making incredible money in this.

73. On March 9, 2014, Labriola appeared onstage at the event in Boston where TelexFree announced the new compensation plan that required each investor to have five VoIP customers. He can be seen in a video of the event that was posted on YouTube on April 7, 2014 with the title "TelexFree International LIVE FROM BOSTON, March 9 – 2014, p.3." In the video, Labriola stated:

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 27 of 53

> We have an unbelievable, unbelievable product in our pocket.
>
> We have the best marketing plan on the planet and it's about to get better.
>
> The potential is limitless.

74. Labriola can be heard on a slide presentation that was posted on YouTube on March 17, 2014 with the title "New TelexFree Comp Plan – Randy Crosby + Steve Labriola." In the video, Labriola stated:

> Things are about to get even better.
>
> No one in the corporate office is quitting.

75. Labriola can be seen in a video that was posted on YouTube on April 5, 2014 with the title "TelexFREE Steve Labriola Lots of Questions I Have Answers 4/5/14." In the video, Labriola stated:

> TelexFree is a customer acquisition company. Has been, always will be. We go out and get customers. You go out and get customers. You get residual income on those customers. That's what the business is and that's what it always has been.
>
> We want you to know that we have incredible products for you to go out and sell.
>
> We have the right products. We have the right service.

76. In the April 5, 2014 video, Labriola also stated that TelexFree had more than 500,000 VoIP customers in February 2014. Labriola knew, was reckless in not knowing, or was negligent about the fact that his statement was materially false and misleading because, as noted above, the information available to date indicates that TelexFree made approximately 26,300 retail sales of monthly VoIP contracts during the entire period from August 2012 to March 2014.

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 28 of 53

77. Labriola knew that investors were strongly encouraged to recruit new investors and were not required to sell the VoIP service, that authorities had shut down TelexFree's affiliate in Brazil as an illegal pyramid scheme, and that numerous banks and payment processors had terminated their relationships with TelexFree. Labriola knew, was reckless in not knowing, or was negligent about the fact that TelexFree derived virtually no revenue from retail VoIP sales, while more than 99% of its income came from investors in AdCentral. As a result, Labriola knew, was reckless in not knowing, or was negligent about the fact that his public statements promoting TelexFree, including those quoted in the previous paragraphs, were materially false and misleading and, more generally, that his promotional activities on behalf of TelexFree were fraudulent and deceptive, because TelexFree was a Ponzi and pyramid scheme that was destined to collapse, thereby preventing it from making the payments promised to investors. As the sales manager authorized to make public statements for the company, Labriola's state of mind can be attributed to TelexFree, Inc. and TelexFree, LLC.

**Joseph Craft**

78. Craft was hired as TelexFree's accountant in April 2012, and he was sometimes held out as the company's CFO.

79. Craft prepared financial statements that were submitted to various state telecommunications regulators, as well as the Massachusetts Securities Division. The statements indicated that TelexFree, Inc. and TelexFree, LLC had combined total income of more than $18.3 million in 2012 and more than $1.19 billion in 2013, as well as combined net income of $9 million in 2012 and $55.7 million in 2013.

80. Craft knew, was reckless in not knowing, or was negligent about the facts that numerous banks and payment processors had terminated their relationships with TelexFree, that investors were not required to sell the VoIP service, that TelexFree derived virtually no revenue from retail VoIP sales, that more than 99% of its income came from investors in AdCentral, and that TelexFree's bank statements and credit card transactions reflected total 2013 revenues of less than $300 million. As a result, Craft knew, was reckless in not knowing, or was negligent about the fact that the financial statements he prepared – which claimed total revenues of more than $1.19 billion and did not distinguish between income from investments in AdCentral and income from retail sales of the VoIP service – were materially false and misleading and, more generally, that his preparation of financial statements for TelexFree was fraudulent and deceptive, because TelexFree was a Ponzi and pyramid scheme that was destined to collapse, thereby preventing it from making the payments promised to investors. As the company accountant and de facto CFO, Craft's state of mind can be attributed to TelexFree, Inc. and TelexFree, LLC.

**Actions of the TelexFree Promoters**

81. TelexFree monitored the activities of its promoters, who were not permitted to use marketing materials that had not been posted on the company website or otherwise approved by the company. If TelexFree objected to something posted by a promoter, it could block the promoter's access to the "back office" or even revoke the promoter's registration.

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 30 of 53

**Sanderley Rodrigues**

82. Rodrigues, who met Merrill and Wanzeler in 2006, invested in his first AdCentral contract in February 2012 and began working full-time for TelexFree in June 2012. He became a prominent promoter of TelexFree, especially within the Brazilian community in Massachusetts and elsewhere and with his contacts in Brazil. He appeared at public events and in promotional videos that were posted on YouTube (he posted at least one video himself). Many of his videos were in Portuguese. He claimed to have made $3 million through his promotion of TelexFree.

83. Rodrigues can be seen in a video that was posted on YouTube on April 17, 2013 with the title "TelexFree USA first Millionaire Sann Rodriguez [sic] Tells His Story." (The video was originally posted by Sloan on March 13, but after the Commission filed this case, Sloan removed the video from YouTube.) In the video, Rodrigues stated:

> Everybody gets paid weekly in TelexFree.
>
> Just place your ads every day and everyone gets paid weekly.
>
> What company in the country, in the world, you can make money … you don't need to sell anything? Now it exists, TelexFree.
>
> When I put my heart in this business, my life changed. I now have many, many options.
>
> I think that TelexFree is forever.
>
> I am the first multi-millionaire. I make three millions.

84. Rodrigues can be seen in a video that was posted on YouTube on August 17, 2013 with the title "TelexFree Intervención y testimonios Sann Rodriguez [sic] y Santiago De La Rosa." He spoke in Portuguese with simultaneous translation into English. In the video,

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 31 of 53

Rodrigues stated that he had been involved in multi-level marketing companies for over twenty years. (He failed to mention that in 2007, as noted above, he settled federal securities fraud charges concerning one of those companies.) He stated that, when he heard about TelexFree in February 2012, "I knew that the plans, the marketing system, everything was different from what I was used to." He claimed that he refinanced a car to get enough money for his initial investments. He also stated:

> My life all of a sudden started changing drastically. Every week, more and more bonuses for the sales of my teams. And then I was over six digits weekly.
>
> Everybody should get paid weekly.
>
> I have people in sixty different countries, and everything started with a meeting in Boston with four people.
>
> Your decision can change your life.
>
> The decision can change your life totally.

85. Rodrigues knew that investors were strongly encouraged to recruit new investors and were not required to sell the VoIP service. Given his "back office" access to information about purchases of AdCentral memberships and the VoIP service by members of his network, Rodrigues knew, was reckless in not knowing, or was negligent about the fact that TelexFree derived very little revenue from retail VoIP sales, while virtually all of its income came from investors in AdCentral. As a result, Rodrigues knew, was reckless in not knowing, or was negligent about the fact that his public statements promoting TelexFree, including those quoted in the previous paragraphs, were materially false and misleading and, more generally, that his promotional activities on behalf of TelexFree were fraudulent and deceptive, because TelexFree

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 32 of 53

was a Ponzi and pyramid scheme that was destined to collapse, thereby preventing it from making the payments promised to investors.

**Santiago De La Rosa**

86. De La Rosa met Rodrigues in July 2012 and began recruiting for TelexFree in November 2012. He became a prominent promoter of TelexFree, especially within the Dominican community in Massachusetts and elsewhere. He appeared at public events and in promotional videos that were posted on YouTube. Many of his videos were in Spanish.

87. De La Rosa provided the voiceover for a slide presentation that was posted on YouTube on December 12, 2012 with the title “Telexfree Presentación en Español Santiago De La Rosa.” The presentation contained a detailed description of the two types of AdCentral memberships, the process for placing internet ads, and the various bonus and commission plans. In the video, De La Rosa stated (as translated from Spanish into English):

> The business opportunity has finally arrived where you don’t have to make monthly payments, you don’t have to make deliveries or buy anything. Simply work from the comfort of your own home making ads for this wonderful company that is TelexFree.

88. De La Rosa can be seen in a video that was posted on YouTube on July 21, 2013 with the title “Testimonio Santiago de la Rosa Vision telexfree.” In the video, De La Rosa made the following statements (as translated from Spanish into English):

> How did Telexfree change my life? 360 degrees, only five months ago my family only had 100 dollars in savings.
>
> I can’t say I am a millionaire or multi-millionaire, but will be in the next couple of months.

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 33 of 53

> Now we have an account in the bank with more than six figures.
>
> How is TelexFree different from other marketing networks? The first network where you can decide what salary you want and make it happen. If you want $500 dollars per week you can make it happen by buying five AdCentral Family.

89. De La Rosa can be seen in the YouTube video identified above that was posted on August 17, 2013. He spoke in Spanish with simultaneous translation into English. In the video, De La Rosa stated that he bought his first AdCentral Family contract in July 2012, but by November 2012, his income "had dropped drastically" and he was parking his car at his mother-in-law's house to avoid having it towed. He stated that he began actively trying to recruit for TelexFree that month, but when he was invited to meet friends in Florida, he could not afford the $80 charge to check his luggage. He then recounted his success as a promoter and stated:

> I think it's very easy to do this opportunity here at TelexFree. Everybody should understand if you want to grow a lot in this business. First thing. You need to learn the basics of the business. How to place an ad. How to register a client. How to register a promoter. Become a professional in those three things.

90. De La Rosa can be seen in a video that was posted on YouTube on September 19, 2013 with the title "Santiago De La Rosa – TelexFree Long Island Recomendado!!" The video contained a detailed description of the AdCentral Family plan. In the video, De La Rosa stated (in English):

> Every day 365 days a year you place an ad.
>
> If you cannot sell the product that they give you, the company buys it back from you for $20.

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 34 of 53

> $50 plus $289 that $339 and the company pays you 20 times 52 = $1,040.

91. De La Rosa provided the voiceover for a slide presentation that was posted on YouTube on October 16, 2013 with the title "TelexFree Business Presentación – En Español con Santiago De La Rosa." In the video, De La Rosa stated (as translated from Spanish into English), "Posting the daily ads is easy, simply copy and paste."

92. On March 9, 2014, De La Rosa appeared onstage at the event in Boston where TelexFree announced the new compensation plan that required each investor to have five VoIP customers. He can be seen in a video of the event that was posted on YouTube on April 7, 2014 with the title "TelexFree International LIVE FROM BOSTON, March 9 – 2014, p.1." In the video, De La Rosa stated, "We don't imagine the big amount of income we will make on the customer side. It's easy."

93. De La Rosa can be heard in a video that was posted on YouTube on April 1, 2014 with the title "April 1 TelexFree Update Call (No Joke) Old Contracts Get Your Customers." In the video, De La Rosa tried to reassure investors despite the change to the compensation plan:

> The company will pay you until your contracts expire.
>
> Everybody be sure that nobody gonna lose their money.
>
> Everybody's going to be happy.

94. De La Rosa knew that investors were strongly encouraged to recruit new investors and were not required to sell the VoIP service. Given his "back office" access to information about purchases of AdCentral memberships and the VoIP service by members of his network, De La Rosa knew, was reckless in not knowing, or was negligent about the fact that TelexFree

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 35 of 53

derived very little revenue from retail VoIP sales, while virtually all of its income came from investors in AdCentral. As a result, De La Rosa knew, was reckless in not knowing, or was negligent about the fact that his public statements promoting TelexFree, including those quoted in the previous paragraphs, were materially false and misleading and, more generally, that his promotional activities on behalf of TelexFree were fraudulent and deceptive, because TelexFree was a Ponzi and pyramid scheme that was destined to collapse, thereby preventing it from making the payments promised to investors.

**Randy Crosby**

95. Crosby started with TelexFree in December 2012 and became a prominent promoter. During one corporate update, Labriola described Crosby as "one of our top leaders" and added, "You hear from Randy all the time." Crosby made daily marketing presentations and appeared in promotional videos that were posted on YouTube. He also touted TelexFree through a website called "everybodygetspaidweekly.biz".

96. Crosby provided the voiceover for a slide presentation that was posted on YouTube on April 20, 2013 with the title "TelexFree Webinar Presentation + Leaders in HD." In the video, Crosby stated, "I give this presentation every day, several times a day." He emphasized how easy it was to place internet ads:

> When I got into this company back in December I didn't know how to advertise, but since it was so simple a 5-year-old could do it… We copy, paste, and validate. It's just that's simple. Everybody can cut and paste.
>
> It's real simple on how to get started. Everyone becomes an associate with the company with $50 cost. There is no monthly cost. You will learn the basics. You place an ad about the TelexFree service. The ads are already written.

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 36 of 53

> You simply copy and paste the ads on free advertising sites. We even provide you with a list of free advertising sites. It's that simple.
>
> It takes less than 30 seconds to place each ad. Most people do it in 15 to 20 seconds.

He explained that investors were paid to help TelexFree "get noticed":

> Everybody knows that comes into this company that because they're advertising, and helping the company build, and helping the company be noticed, as a promoter they are now putting themselves in a position to simply receive income by helping the company get noticed.
>
> They're paying us to advertise the service. It's just that simple.

He explained that investors did not need to sell anything to get paid:

> You can make money every week even if you didn't make a sale that week.
>
> If it [a VoIP package] doesn't sell to the public, then you can sell them [sic] back to the company for $20… Either way, you will earn income.
>
> Your contracts are not dependent on somebody else saying yes or no, and that makes you in the driver's seat because you are in control.
>
> We don't have people that join and can't make money because they can't recruit or can't sell to the public. Everybody gets paid weekly.

He also waxed eloquent on how easy it was to make lots of money through TelexFree while doing virtually nothing:

> We are the pioneers in this industry and we have caused more people to become successful, dozens and dozens of millionaires because of this.

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 37 of 53

> Compensation plan is top of the line just like a Bentley car – paying up to $15,360 per day.
>
> Doesn't matter what plan you sign the customer up for, either AdCentral or AdCentral Family contract, the more contracts you own the more income you can make, without sponsoring or recruiting or worry about selling to public, you know what you're going to make.
>
> Most people can't understand the type of income you can earn.

97. Crosby can be seen in a video that Sloan posted on YouTube on May 17, 2013 with the title "TelexFree Superweekend Orlando (May 11, 2013) with Randy Crosby on the opportunity." In the video, Crosby stated:

> All we do is place ads. It's simple. (The camera panned to a slide showing "Place Your Ads Daily and Get Paid … SIMPLE".)
>
> How many people would like to take $1,375 and put it in their closet and come back a year from now, all you have to do is open your closet door every day. Right? For 365 days and walk back in now and that $1,375 is $5,200. Would everybody like a policy like that? Guys, we don't need a policy, we've got TelexFree.

Crosby can be seen in another video from the same event that Sloan posted on YouTube on May 21, 2013 with the title "TelexFree Orlando, FL (May 11, 2013) Superweekend Panel." (After the Commission filed this action, Sloan removed both videos from YouTube.) In this video, Crosby is shown introducing a number of other top TelexFree promoters, including Rodrigues, De La Rosa and Sloan, to the audience.

98. Crosby provided the voiceover for a slide presentation that was posted on YouTube on October 3, 2013 with the title "TelexFREE en English Presentation Webinar with Randy Crosby." In the video, Crosby encouraged viewers to register through his website. Once

Case 1:14-cv-11858-NMG Document 435 Filed 09/28/17 Page 38 of 53

again, he spoke at length about how AdCentral investors could make lots of money without selling the VoIP service:

> We're sharing an opportunity that is nothing like anything else out there.
>
> This is not like anything you ever tried before.
>
> TelexFree has produced the solution to everybody's problems.
>
> Instead of 80-90% of people not making money in other sales companies, you have this company where 100% of the people earn income without sponsoring or without selling to the public.
>
> You will still profit weekly with this company even if everybody said NO to your product or service, or if they say NO they don't want to join this opportunity right now.
>
> Company is simple, you place ads over the internet and you get paid.
>
> If the one new TelexFree99 package each week doesn't sell to the public, then you can sell it back to the company and earn 40% of the retail price, that is $20 per week times 52 weeks equals $1,040 a year.
>
> What's so unique is that you have all the control. See I didn't say anything about recruiting people, or how many sold to the public. I gave you worst case scenario, with you just placing your ads per day, it puts you in line to earn tons of income.

99. On March 9, 2014, Crosby appeared onstage at the event in Boston where TelexFree announced the new compensation plan that required each investor to have five VoIP customers. He can be seen in the video identified above that was posted on April 7, 2014. In the video, Crosby stated:

> I am more excited about TelexFree today than when I first got started.
>
> How many people would like to make more money?... I don't think they understand the amount of income potential that the customers are going to bring.
>
> People are going to want what you have because of the power of what the service does.
>
> I promise you, you cannot imagine how many people will sign up and become your customer and tell their friends to become your customer.

In the video, De La Rosa credited Crosby with coming up with the slogan, "Everybody gets paid weekly."

100. Crosby provided the voiceover for a slide presentation that was posted on YouTube on March 20, 2014 with the title "Randy Crosby New Comp Plan 30 Min 3-20-2014." In the video, Crosby stated that, when he started with TelexFree in December 2012, he was broke and being hounded by creditors. He then proceeded to tout the advantages of TelexFree:

> There's been a lot of people who have made a lot of money in this company.
>
> It just doesn't matter that you were in first.
>
> We post ads… We spend just a few minutes a day, copying ads that are already written, so we don't have to think about what to say, and we paste them on free websites out there, classified sites, to draw more people to get and try the service.

101. Crosby can be seen in the video identified above that was posted on YouTube on April 1, 2014. In the video, Crosby tried to reassure investors about the new compensation plan: "Bottom line – nobody loses a dime."

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 40 of 53

102. Crosby knew that investors were strongly encouraged to recruit new investors and were not required to sell the VoIP service. Given his "back office" access to information about purchases of AdCentral memberships and the VoIP service by members of his network, Crosby knew, was reckless in not knowing, or was negligent about the fact that TelexFree derived very little revenue from retail VoIP sales, while virtually all of its income came from investors in AdCentral. As a result, Crosby knew, was reckless in not knowing, or was negligent about the fact that his public statements promoting TelexFree, including those quoted in the previous paragraphs, were materially false and misleading and, more generally, that his promotional activities on behalf of TelexFree were fraudulent and deceptive, because TelexFree was a Ponzi and pyramid scheme that was destined to collapse, thereby preventing it from making the payments promised to investors.

**Faith Sloan**

103. Sloan was a prominent promoter of TelexFree. She referred to herself as "one of the TelexFree leaders," and during one corporate update, Labriola described her as a "great leader" who "is on all the [update] calls." She operated websites touting TelexFree, using names such as "telexfreepower.com", "telexfreeprogram.com", and "telexfree.faithsloan.com". She also appeared in promotional videos that were posted on YouTube.

104. An internet search for "telexfreepower.com" and "telexfree.faithsloan.com" currently leads to the same website.

a. The "HOME" page of the website states:

> TelexFREE Global Team prides itself on providing you stellar support, tools, and a place to meet new people while earning MASSIVE Income! Contact the Person Who Sent

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 41 of 53

> you Here or Call me at 1-800 670 3202. skype: faithsloan. email: telexfreeglobalteam@gmail.com To JOIN TELEXFREE.

b. The "ABOUT TELEXFREE" page of the website states, "Telexfree MLM [multi-level marketing] business was launched in Brazil 2012. They have over 1 million customers and distributors." The page also contains a video by Carlos Costa, who identified himself as the company's Director of Marketing. The video (in Portuguese with simultaneous English translation) was apparently filmed soon after TelexFree's affiliate in Brazil was shut down in June 2013. In the video, Costa tried to reassure investors:

> We are working in a serious manner, in an honest manner.
>
> You are doing a marvelous job, a job that has never been seen before in any company in the internet or multi-level marketing.
>
> You, promoter of TelexFree, you do not need to be worried about anything. We are here to work with and for you.

c. The "COMPENSATION PLAN" page of the website contains comments by Sloan, a slide presentation about the new plan announced on March 9, 2014, and an invitation to "contact me, Faith Sloan, if you are trying to get your money out of the OLD PLAN." The page also contains emails between Sloan and investors going back to February 12, 2013. In an email dated February 24, 2013, Sloan told a correspondent, "The network marketers and builders such as myself plays [sic] an active role because we see the money in the compensation plan and the products." She also wrote, "You can come aboard and just place your ads daily and still can make up to $100 a week by doing that small task." Later that day, she told a correspondent who had invested in three AdCentral Family packages, "[T]he bare minimum you will receive just for

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 42 of 53

placing ads is $300 a week for 52 weeks = $15,000. In 14.25 weeks, you will have your $4275.00 back in your hands! The rest is gravy for doing the marketing."

d. The "HOW TO" page of the website states:

Place Ads – Earn Weekly CASH
OR
Build a Team and Earn MUCH More!

TelexFree Has Created Millionaires
In Brazil In Just 15 Months!

TelexFree Now accepting USA/Canada and International members.

FREE Ad Publishing sites. See Menu Above.

105. Sloan can be seen in a video that she posted on YouTube on June 12, 2013 with the title "TelexFree Faith Sloan TelexFree Global Power Team Webinar." (After the Commission filed this action, Sloan removed the video from YouTube.) In the video, she stated:

> Everybody in TelexFree gets paid weekly. Everybody.
>
> You post your ads. Take you a minute and a half. Three minutes. Five minutes max.
>
> Place your ads, and you go about your day. You do that for seven days a week, you get paid every single week.
>
> You don't have to build. You don't have to sell.
>
> There's nothing out there like this.

106. Sloan knew that investors were strongly encouraged to recruit new investors and were not required to sell the VoIP service. Given her "back office" access to information about purchases of AdCentral memberships and the VoIP service by members of her network, Sloan knew, was reckless in not knowing, or was negligent about the fact that TelexFree derived very little revenue from retail VoIP sales, while virtually all of its income came from investors in

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 43 of 53

AdCentral. As a result, Sloan knew, was reckless in not knowing, or was negligent about the fact that her public statements promoting TelexFree, including those quoted in the previous paragraphs, were materially false and misleading and, more generally, that her promotional activities on behalf of TelexFree were fraudulent and deceptive, because TelexFree was a Ponzi and pyramid scheme that was destined to collapse, thereby preventing it from making the payments promised to investors.

**Diversion of Investor Funds**

107. The information available to date indicates that Merrill and Wanzeler, who had sole authority to transfer TelexFree corporate funds until the bankruptcy filing, caused more than $33 million to be transferred from TelexFree accounts to themselves, to family members, to the other individual defendants, or to companies under their control (including the relief defendants).

**James Merrill**

108. The information available to date indicates that, between September 2012 and December 2013, Merrill received more than $3.2 million from TelexFree.

a. On December 27, 2013, TelexFree paid $3 million to an account jointly held by Merrill and his wife.

b. On December 26, 2013, TelexFree paid $136,200 to Merrill.

c. Between September 2012 and February 2013, TelexFree paid a total of $85,000 to Merrill, primarily in monthly payments of $7,500.

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 44 of 53

**Carlos Wanzeler**

109. The information available to date indicates that, between November 2012 and February 2014, Wanzeler and members of his family received almost $13.7 million from TelexFree.

a. On April 3, 2014, Wanzeler obtained a cashier's check for nearly $3.8 million.

b. On February 28, 2014, Katia Wanzeler, the defendant's wife, received $2.5 million.

c. On December 26 and 27, 2013, Wanzeler received a total of $7,317,800.

d. Between November 2012 and April 2013, Fabio Wanzeler, the defendant's brother, received more than $53,000.

e. In addition, on April 11, 2014 – two days before the bankruptcy filings – Katia Wanzeler and Merrill visited a bank where TelexFree, LLC had an account and obtained cashier's checks for more than $25 million. One check, in the amount of $2,000,634, was payable to Katia Wanzeler. That cashier's check is one of the items seized by federal agents at TelexFree's office on April 15, 2014.

110. Wanzeler transferred a significant portion of the money he received from TelexFree to at least one bank outside the United States.

a. On November 25, 2013, he sent $50,000 to an account at the Oversea-Chinese Banking Corporation in Singapore.

b. On January 2, 2014, he sent an additional $3.5 million to an account at the same bank.

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 45 of 53

111. Wanzeler used investor funds to build a small real estate empire.

a. He made most of the acquisitions using companies under his control, including: (i) JC Real Estate Management Company LLC, a Nevada limited liability company that was formed in July 2012 with Wanzeler and Merrill as managers; (ii) Above & Beyond the Limit, LLC ("Above & Beyond"), a New Mexico limited liability company that Craft formed for Wanzeler in September 2012, (iii) CNW Realty State, LLC, a Nevis corporation that was formed in October 2012 with Above & Beyond as manager; (iv) KC Realty State LLC, a Florida limited liability company that Craft formed in October 2012 with Katia Wanzeler as manager; (v) Acceris Realty Estate, LLC, a Massachusetts limited liability company that Craft formed in February 2013 with Katia Wanzeler as manager; and (vi) Makeover Investments LLC, a Florida limited liability company that was formed in July 2013 with Marilza Wanzeler, Wanzeler's 65-year-old mother, as a manager.

b. The information available to date indicates that, between July 2012 and February 2014, Wanzeler paid approximately $6.3 million – primarily in cash – for 34 properties in Massachusetts and Florida, including a $950,000 house for himself and his wife in Northborough, Massachusetts, and a $450,000 house for his son in Coconut Creek, Florida.

112. Wanzeler also used investor funds to buy expensive cars and boats.

a. He acquired a fleet of fancy automobiles. He paid $192,868 for two Ferrari F340 Spiders in March 2013 and $56,610 for a Porsche in February 2013. He also bought three BMW's and a Toyota Highlander.

b. He bought three boats, including a 40-foot yacht for which he paid $273,878 in cash in October 2013.

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 46 of 53

**Steven Labriola**

113. The information available to date indicates that Labriola received approximately $8,500 from TelexFree in 2013 and approximately $46,600 from Wanzeler's company Above & Beyond.

**Joseph Craft**

114. The information available to date indicates that, between September 2013 and March 2014, companies under Craft's control (including Craft Financial Solutions, Inc. and Craft Trust Services, LLC) received more than $2 million from TelexFree.

**Sanderley Rodrigues**

115. The information available to date indicates that, between September 2012 and March 2013, Rodrigues and companies under his control received $317,220 from TelexFree. (As noted above, Rodrigues claims to have received more than $3 million by promoting TelexFree.)

a. On February 28 and March 15, 2013, TelexFree paid a total of $231,367 to WWW Global Business Inc., a corporation that Rodrigues owns.

b. In September and October 2012, TelexFree paid a total of $82,254 to Rodrigues.

c. On October 9, 2012, TelexFree paid $3,600 to VICSS, Inc., a corporation that Rodrigues controls.

116. Rodrigues used investor funds to buy expensive automobiles, including a Lamborghini, a Ferrari, and two Mercedes Benz.

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 47 of 53

**Santiago De La Rosa**

117. The information available to date indicates that, between April 2013 and April 2014, Magica Medica Corp. ("Magica Medica"), a Massachusetts corporation that De La Rosa formed in March 2013, received a total of more than more than $2.2 million, of which up to $2.1 million is believed to have come from investors, most of whom paid $1,425 each for AdCentral Family memberships. (For reasons that are currently unknown, Magica Medica also received $17,400 from Crosby.)

118. De La Rosa used investor funds to support his lifestyle.

a. He paid $501,000 in cash for a house in Lynn, Massachusetts.

b. He made payments to a BMW dealership and a Mercedes Benz dealership.

**Randy Crosby**

119. The information available to date does not identify the amount that Crosby received from TelexFree. It is apparent, however, that Crosby received a substantial amount from TelexFree. As noted above, he publicly claims to have been broke when he began promoting TelexFree in December 2012. Nevertheless, he paid $70,000 in cash for a Porsche in September 2013 and $99,000 in cash for another Porsche in December 2013.

**Faith Sloan**

120. The information available to date indicates that, between March 2013 and April 2014, Sloan received more than $160,400 from TelexFree investors and $51,000 from TelexFree itself.

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 48 of 53

**Relief Defendants**

121. The information available to date indicates that the relief defendants received more than $6.6 million from TelexFree in 2013:

a. On December 30 and 31, 2013, TelexFree paid a total of $6,005,000 to TelexFree Financial.

b. According to the financial statements for 2013 prepared by Craft, TelexFree, LLC made a $2,022,329 "loan" to TelexElectric.

c. According to the financial statements for 2013 prepared by Craft, TelexFree, LLC made a $500,870 "loan" to Telex Mobile.

**Missing Investor Funds**

122. The whereabouts and/or disposition of much of the more than $340 million of investor funds raised by TelexFree is presently unknown.

**FIRST CLAIM FOR RELIEF**
**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5)**

123. The Commission repeats and incorporates by reference the allegations in paragraphs 1-122 of the Complaint as if set forth fully herein.

124. Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) have employed or are employing devices, schemes or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state a material fact necessary to make the statements made, in the

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 49 of 53

light of the circumstances under which they were made, not misleading; or (c) have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

125. As a result, defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C.§78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

**SECOND CLAIM FOR RELIEF**
**(Violation of Section 17(a) of the Securities Act)**

126. The Commission repeats and incorporates by reference the allegations in paragraphs 1-122 of the Complaint as if set forth fully herein.

127. Defendants, directly and indirectly, acting intentionally, knowingly or recklessly, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails: (a) have employed or are employing devices, schemes or artifices to defraud; (b) have obtained or are obtaining money or property by means of untrue statements of material fact or omissions to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) have engaged or are engaging in transactions, practices or courses of business which operate as a fraud or deceit upon purchasers of the securities.

128. As a result, defendants have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 50 of 53

**THIRD CLAIM FOR RELIEF**
**(Violation of Section 5(a) of the Securities Act)**

129. The Commission repeats and incorporates by reference the allegations in paragraphs 1-122 of the Complaint as if set forth fully herein.

130. Defendants TelexFree, Inc. and TelexFree, LLC have never been registered with the Commission, nor have they ever registered or attempted to register any offering of securities under the Securities Act or any class of securities under the Exchange Act.

131. Defendants, directly or indirectly: (a) have made or are making use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) have made or are making use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

132. As a result, defendants have violated and, unless enjoined, will continue to violate Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

**FOURTH CLAIM FOR RELIEF**
**(Control Person Liability under Section 20(a) of the Exchange Act as to Defendants Merrill and Wanzeler)**

133. The Commission repeats and incorporates by reference the allegations in paragraphs 1-122 of the Complaint as if set forth fully herein.

Case 1:14-cv-11858-NMG Document 435 Filed 09/28/17 Page 51 of 53

134. By engaging in the conduct described above, defendants TelexFree, Inc. and TelexFree, LLC have, directly or indirectly and singly or in concert, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the mail: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material fact(s) necessary to make statements made not misleading in light of the circumstances under which they were made; and/or (c) engaged in transactions, acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

135. At all relevant times, defendants Merrill and Wanzeler owned and controlled TelexFree, Inc. and TelexFree, LLC.

136. Defendants Merrill and Wanzeler did not act in good faith, and they directly or indirectly induced the acts or actions constituting the violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by TelexFree, Inc. and TelexFree, LLC.

137. As a result, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. §78t(a)], defendants Merrill and Wanzeler are jointly and severally liable with, and to the same extent as, TelexFree, Inc. and TelexFree, LLC for their violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 52 of 53

**FIFTH CLAIM FOR RELIEF**
**(Unjust Enrichment of Relief Defendants**
**TelexFree Financial, TelexElectric, and Telex Mobile)**

138. The Commission repeats and incorporates by reference the allegations in paragraphs 1-122 of the Complaint as if set forth fully herein.

139. TelexFree Financial, TelexElectric, and Telex Mobile have no legitimate interest in, or right to, the funds they received from TelexFree, Inc. and TelexFree, LLC, which represent the proceeds of the fraud alleged above.

140. As a result, relief defendants TelexFree Financial, TelexElectric, and Telex Mobile are liable for unjust enrichment and should be required to return their ill-gotten gains, with pre-judgment interest.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that this Court:

A. Enter a permanent injunction restraining the defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of:

1. Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5];
2. Section 17(a) of the Securities Act [15 U.S.C. §77q(a)]; and
3. Section 5 of the Securities Act [15 U.S.C. §77e];

Case 1:14-cv-11858-NMG Document 429-1 Filed 09/12/17 Page 53 of 53

B. Require the defendants and relief defendants to disgorge their ill-gotten gains, plus pre-judgment interest, with said monies to be distributed as ordered by the Court;

C. Order the defendants to pay appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

D. Enter an order, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)], barring defendant Wanzeler from serving as an officer or director of any issuer required to file reports with the Commission pursuant to Sections 12(b), 12(g), or 15(d) of the Exchange Act [15 U.S.C. §78l(b), §78l(g), 78o(d)];

E. Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F. Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/_Deena R. Bernstein____________________

Deena R. Bernstein (Mass. Bar No. 558721)
Senior Trial Counsel
Attorney for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
(617) 573-8960 (Huntington direct)
(617) 573-4590 (fax)
huntingtonf@sec.gov (Huntington email)

Dated: September 12, 2017